## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STATISTICA CAPITAL LTD. and STATISTICA LTD.,

    Plaintiffs,

              v.

FEDERAL DEPOSIT INSURANCE CORPORATION as
RECEIVER for SIGNATURE BANK, JOSEPH
DEPAOLO, SCOTT A. SHAY, STEPHEN WYREMSKI,
and ERIC HOWELL,

    Defendants.

Case No.: 1:23-CV-993

**SECOND AMENDED COMPLAINT**

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs STATISTICA CAPITAL LTD. and STATISTICA LTD, by and through their undersigned counsel, hereby sue Defendants FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") as RECEIVER for SIGNATURE BANK (at times "SBNY," "Signature," "Signature Bank" or "Bank"),[1] JOSEPH DEPAOLO, SCOTT A. SHAY, STEPHEN WYREMSKI, and ERIC HOWELL, and allege the following upon their knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.    Plaintiffs bring this action because Defendants had actual knowledge of and substantially facilitated the now-infamous FTX fraud, causing Plaintiffs to lose millions of dollars. In doing so, Defendants committed serious errors, including both acts and omissions, and made further misstatements and misleading statements. In particular, Defendants actively pursued—and profited handsomely from—rapid growth by taking on cryptocurrency business without engaging commensurate risk management; failed to adequately

---

[1] On June 30, 2023, the parties submitted a Joint Status Report informing the Court that, on "March 12, 2023, the New York State Department of Financial Services closed Signature Bank and appointed the FDIC as the Bank's receiver. On March 15, 2023, the FDIC-Receiver filed a notice substituting into the action as the Defendant in place of Signature Bank" and that, as a result, "[t]he FDIC-Receiver requests that the Clerk amend the case caption to reflect its substitution for Signature Bank," Dkt. No. 45. The Court endorsed and granted this requested order the same day. *See id*. at 3.

mitigate liquidity risks and over-relied on uninsured deposits, including crypto deposits, to enrich themselves at the expense of depositors; and knew of, and permitted, the commingling of FTX customer funds within the Bank's proprietary, blockchain-based payments network, Signet. And when regulators expressed concerns over the Bank's unreasonable risk-taking and lack of anti-money laundering controls, Defendants failed to timely respond—or respond at all.

2.     Plaintiffs themselves advised Signature on multiple occasions that their funds were intended for FTX, but Signature nevertheless allowed Plaintiffs' funds to be transferred via Signet and by wire into Alameda-controlled accounts, where Defendants knew or should have known they would be stolen.

3.     Plaintiffs bring this action to recover compensation for the damages they suffered as a result of Defendants' malfeasance.

## THE PARTIES

4.     Plaintiff Statistica Capital Ltd. ("Statistica Capital") is a British Virgin Islands limited company and is licensed as an Approved Manager by the Financial Services Commission of the British Virgin Islands.

5.     Plaintiff Statistica Ltd. is a British Virgin Islands limited company. Prior to a name change and during the relevant time period, the entity was called Statistica Fund Ltd., and is referred to herein as "Statistica Fund."

6.     Defendant Signature is a New York chartered commercial bank with its principal executive offices at 565 Fifth Avenue, New York, New York, 10017. Signature's stock is publicly traded over the counter under the ticker "SBNY."

7.     Defendant Joseph J. DePaolo is an individual who resides in New York State. Together with Defendant Scott A. Shay and John Tamberlane, DePaolo founded SBNY in 2001. DePaolo served as SBNY's President and Chief Executive Officer at all relevant times and was responsible for all strategic and business aspects of the Bank. He also served as a Director on SBNY's Board of Directors from when the Bank went public in 2004 through its eventual closure in March 2023.

8.     Defendant Scott A. Shay is an individual who resides in New York State. Shay co-founded the Bank in 2001 and served as the Chairman of SBNY's Board since its inception.

9.      Defendant Eric Howell is an individual who resides in New York State. Howell served as SBNY's Senior Executive Vice President and Chief Operating Officer from June 2021 to March 2023. In this role, Howell was primarily responsible for overseeing SBNY's day-to-day operations. Beginning in 2022, Howell also served as a member of SBNY's Board. Prior to these roles, Howell served as SBNY's Senior Executive Vice President of Corporate and Business Development from April 2013 to June 2021.

10.     Defendant Stephen D. Wyremski is an individual who resides in New York State. Wyremski served as SBNY's Senior Vice President and Chief Financial Officer from June 30, 2021, to March 2023. In this role, Wyremski was primarily responsible for managing SBNY's finances and overseeing the Bank's financial reporting. Prior to having this role, Wyremski served as SBNY's Controller from 2015 to 2021.

11.     These former SBNY officers, executives, and directors (collectively referred to herein as the "Individual Defendants"), because of their positions within the Bank, possessed the power and authority to control, and did in fact control SBNY's decision making. They were also responsible for public statements, for FDIC and SEC filings, press releases, the Bank's website, and presentations to securities analysts, money and portfolio managers, and the media. In their respective roles, each Individual Defendant was directly involved in preparing, reviewing, and approving the Bank's decisions.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants have diverse citizenship and the amount in controversy is greater than $75,000.

13.     This Court has personal jurisdiction over Defendants because they have purposely availed themselves of the benefits and privileges of conducting business activities within the State, or reside within this State.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants reside (*i.e.*, are subject to personal jurisdiction) in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS

### I.    CRYPTOCURRENCY AND BLOCKCHAIN

15.    A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Cryptocurrency is the common name given to a set of unique digital assets that exist and can be transferred on peer-to-peer networks, called blockchains, using cryptography, rather than requiring facilitation from a financial institution.

16.    These networks can be decentralized (spread across a network of internet-connected computers that no one person or group controls), or centralized (controlled by some party). Unlike government-issued fiat currency, cryptocurrencies exist purely as digital entries in an online database, often known as a public or distributed ledger. Peer-to-peer transactions are placed in "blocks" for verification, and once verified as legitimate, the blocks are recorded in a public ledger, or blockchain, that is unique to a particular cryptocurrency. When a transaction is verified, it is given a unique alphanumeric identifier, called a "hash." Because ledgers are spread across a network of computers that record all transactions, entries on public ledgers are time-stamped and immutable, meaning that all cryptocurrency transactions are traceable.

17.    The native cryptocurrency on an individual blockchain is called a "coin," but there is another type of common blockchain-based digital asset called a "token." Coins and tokens have unique characteristics. Coins operate on an independent blockchain specifically created to launch and record transactions for that coin. Because it requires building a blockchain, creating and launching a coin is difficult and labor intensive. Coins are intended to function as digital money with purchasing power and are designed to have the attributes of more traditional currency: scarcity, durability, and inherent value. By contrast, tokens operate on top of existing blockchains and require less expertise or expense to launch. In this regard, tokens can be created by an issuer "out of thin air." Moreover, tokens can be created by an issuer for a variety of reasons, to represent a variety of assets or services.

18.    New coins are "minted," or issued, by "mining," which involves "miners" solving complex math problems to validate transactions and be rewarded with freshly minted coins. The process uses sophisticated hardware to compute extremely complex math problems. The first computer to find the solution to the problems receives the next block of coins and the process begins again. This verification process is

known as "proof of work." Tokens, by contrast, are created and distributed at the issuers' discretion and are thus much easier to create and acquire (although their creation is still called minting).

19.     Cryptocurrencies can also be destroyed through a process called "burning" to effectively take the assets out of circulation permanently. To execute a cryptocurrency burn, crypto destined to be destroyed is sent to an "eater address," or a burn wallet, which is a digital wallet that only receives tokens, but cannot send them. Those coins are thus effectively locked up and taken out of circulation. That transaction, confirmed on the blockchain ledger, makes the burn permanent and irrevocable.

20.     There is a particular type of coin called a "stablecoin." Stablecoins' putative purpose is to remain stable in value by being pegged to some underlying store of value. For (a simplified) example, a stablecoin issuer might place $1 billion in a bank account, then issue one billion $1 stablecoins effectively underwritten by the fiat asset. Many stablecoins are pegged to fiat (and several pegged 1-to-1 to U.S. dollars specifically), but others are backed by portfolios of currencies, commercial paper, and other financial assets. Stablecoins are the most-traded digital assets because they function as intermediaries between both fiat and crypto, and between crypto pairs for which there may not be much liquidity.

21.     Cryptocurrencies (both coins and tokens) must be stored in digital "wallets." These are applications that store the passkeys (*i.e.*, private codes) used by owners to engage in cryptocurrency transactions. Digital wallets also provide the interface that lets owners access and transfer their digital assets.

## II.     SIGNATURE'S DIGITAL ASSET BUSINESS

### A.     Signature's Formation and Entrance into the Cryptocurrency Industry

22.     Signature was incorporated as a New York State-chartered bank in September 2000; commenced operations in May 2001; and went public in March 2004. Until it was taken over in March 2023 by New York Department of Financial Services ("NY DFS") and placed into the FDIC's receivership, Signature was a full-service commercial bank with 40 private client offices throughout New York, California, Connecticut, North Carolina, and Nevada. Signature took a single-point-of-contact approach to its business, wherein the Bank's network of private client banking teams served the needs of privately-owned businesses.

23.     As one of only a handful of institutions providing banking services to the cryptocurrency industry during the relevant time, Signature was well known as one of the most crypto-friendly banks in the

United States. Signature began its foray into the crypto industry in April 2018, with the hiring of a five-person Digital Asset Banking team. By 2020, the group had grown to 12 employees. Before its closure in 2023, Signature had relationships with many institutional participants that made up the digital asset ecosystem, including exchanges, custodians, digital miners, institutional traders, and more.

**B.     Signet**

24.     In December 2018, the NY DFS authorized—and on January 1, 2019, Signature launched—a proprietary blockchain-based payment solution called Signet (or sometimes SigNET), to allow for real-time payments 24/7/365. Signature's 2018 Annual Report described Signet as follows:

> The Signet Platform, which leverages blockchain technology, allows Signature Bank's commercial clients to make payments in U.S. dollars, 24 hours a day, seven days a week, 365 days a year. Transactions made on the Signet Platform settle in real time, are safe and secure, and incur no transaction fees. Signature Bank is the First FDIC-insured bank to launch a blockchain-based digital payments platform. Typically, in the case of real-time payments, funds are transferred between two different institutions. With Signet, funds are transferred in real time between commercial clients of Signature Bank, eliminating any dependence on a third party.

25.     The below image is taken from a 2020 marketing brochure for Signet.



26.     Signet was designed to let Signature clients move money in 30 seconds or less, 24 hours per day, 7 days per week. By contrast, traditional payments using the Swift interbank platform (*i.e.*, wires) or the Automated Clearing House (*i.e.*, ACH transfers) can take as long as three days and are generally unavailable during the weekend and outside of business hours.

27.     Signet worked through an asset tokenization and redemption process, comprised of minting and burning tokens, powered by a permissioned version of the Ethereum blockchain. This process converted U.S. dollars into "signet" tokens, which were one-for-one digital representations of the dollars. Signet tokens were compliant with Ethereum's ERC-20 standard, but unlike other ERC-20-compliant tokens, Signature's digitized dollars were designed to work only on the bank's proprietary Signet platform, and not to interoperate with other exchanges or services. This tokenization process was automated, but Signature had support staff available 24/7 for credential resets and other technical support issues.

28.     In a June 2021 interview, Signature Chairman, Defendant Shay, explained that while signets are similar to stablecoins, they have some advantages:

> What makes Signet a little different is that it is a digital representation of a dollar. In stablecoin, you have a piece of a pool of money. Right? The money is in whatever it's in, at banks. . . . They have a pool of money and you have 1.00001% of that money. That's what stablecoin represents.
>
> What we have is a tad different, in that it's actually a digital representation of this very dollar that I'm putting in the bank. It's actually a dollar in an FDIC bank account, it's not necessarily insured, it's only insured obviously up to the $250,000. But it's actually a deposit at a bank, as opposed to a piece of a pool.
>
> I'm not saying that one's better than the other, but they are different. What we've tokenized, if you will, is that actual dollar you put into Signature Bank. And that also has some attraction for people. That's their dollar, as opposed to a share in a greater pool.

29.     Shay further stated, "The other thing that makes it far superior to stablecoin is you don't have to wait for delays. You don't have to worry about the fact that miners or someone is taking a little piece. If I send you a $1,000, you get a $1,000. There's nobody taking a cut."

30.     NY DFS's authorization of Signet was limited to institutional clients and included required conditions to ensure the Bank maintained robust policies and procedures to address risks and ensure

compliance with New York's strong standards and regulations regarding anti-money laundering, anti-fraud, and consumer protection measures. As a result, when Signet was launched, to use the platform, both parties to a transaction had to be Signature clients holding a minimum of $250,000, and each must have passed the Bank's know-your-customer (KYC) and anti-money laundering (AML) compliance procedures.

31.     As of August 2020, Signature had about 650 clients within its digital asset ecosystem, including cryptocurrency exchanges, over-the-counter brokers, hedge funds, and market makers. By the end of 2021, that had increased to 1,000 clients, with at least 740 of them on Signet. As of January 2023, Signature had 1,410 active digital asset clients transacting $275.5 billion on Signet in the fourth quarter of 2022.

32.     Signet was accessible to those clients in three ways: (i) through Signature's website, (ii) through a client's treasury management system using an API,[2] and (iii) through a third party, such as the Fireblocks digital assets platform.

**C.     The Growth in Signet Use and in Signature's Deposits and Revenue**

33.     Signature did not charge its clients fees for their use of Signet. Rather, Signature recouped its cost of Signet by using the service to attract new customers, grow its client and deposit base, and expand the banking services it supplied to its Signet users. In fact, one of Signature's core business principles was its focus on deposits. Signature's President and CEO, Defendant DePaolo, once told ABA Banking Journal, "Everyone thinks of banking as lending. I think of banking as bringing in deposits."

34.     As a result of Signet's launch, Signature saw significant increases in deposits, which, as shown below, grew 263% in just two years, from $40.4 billion in 2019, to $106.1 billion in 2021. During a

---

[2] API stands for application programming interface, which is a set of definitions and protocols for building and integrating application software. APIs let a product or service communicate with other products and services without having to know how they are implemented. In its 2021 Annual Report, Signature stated:

> Our Application Program Interface (API) connectivity offered through the Signet platform enables clients and developers to directly integrate Signet's instantaneous blockchain payments features within their systems and workflows to access full transactional capabilities. The API integration affords Signet clients the ability to increase their level of financial controls, operational efficiencies and access to capital. It also offers greater efficiency, speed and security when integrating the Bank's digital payments platform directly into their products and services. Our API advancements have been revolutionary for Signet users, and Signet continues to attract an increasing number of clients, deposits and ecosystems. With the implementation of the API, we have seen rapid adoption of Signet by our digital clients.

January 2021 earnings call, DePaolo stated that "our Digital Banking team grew over $8 billion in deposits" in the previous quarter, such that "We have clearly distinguished ourselves as the predominant bank in the digital space."



35.    The Bank's exposure to uninsured deposits dwarfed nearly all of its peers. For example, between 2020 and 2021, the median proportion of uninsured deposits to total assets for a group of peer banks

| Bank | Total Deposits (in Thousands) | % of Total Deposits Uninsured |
|---|---|---|
| Silicon Valley Bank | 175,378,000 | 95% |
| Signature Bank | 106,153,818 | 92% |
| First Republic Bank | 156,321,243 | 75% |
| The Huntington National Bank | 146,382,512 | 71% |
| BMO Harris Bank National Association | 137,817,391 | 66% |
| HSBC Bank USA, National Association | 151,179,446 | 65% |
| Fifth Third Bank, National Association | 176,175,460 | 64% |
| MUFG Union Bank, National Association | 101,482,402 | 58% |
| Manufacturers and Traders Trust Company | 133,685,640 | 55% |
| Keybank National Association | 155,074,869 | 54% |
| Citizen Bank, National Association | 156,829,177 | 50% |
| Morgan Stanley Bank, National Association | 164,020,000 | 47% |
| UBS Bank USA | 111,602,591 | 43% |
| Regions Bank | 141,129,000 | 40% |
| Morgan Stanley Bank, Private Bank, National Association | 125,670,000 | 33% |
| Ally Bank | 145,765,000 | 14% |
| American Express National Bank | 85,493,447 | 14% |
| Discover Bank | 75,525,799 | 11% |
| USAA Federal Savings Bank | 105,070,590 | 8% |

ranged from 31% to 41%, whereas 92% of Signature's deposits were uninsured. As shown below, at the end of 2021, only one of SBNY's peer banks—Silicon Valley Bank, which also spectacularly collapsed—held a larger proportion.

36.    In fact, 2021 was a marquee year for Signature Bank. Transactions on Signet grew from $17.5 billion in the first quarter of 2020 to $213.7 billion in the last quarter of 2021, a growth of more than 1,200% in two years. Total digital asset transaction volume reached $579.4 billion in 2021. According to Signature, its digital asset client base grew more than 55% in 2021, helping to increase Signet's transfer volume by more than 400%. Moreover, new user adoption of Signet resulted in more than $7 billion in growth, while year-over-year deposit balances grew more than 200%. By the end of 2021, the volume of deposits from Signature's digital asset customers had reached $28.73 billion, representing more than 27% of the bank's deposits. As a result, 2021 represented for Signature a year of record revenue growth, record net income, and record asset growth.





37.    In particular, non-interest-bearing deposits at the Bank grew dramatically, which Signature has largely attributed to the success of Signet. In fact, this is an area where Signature saw exponential growth, as demonstrated in the chart below, drawn from data in Signature's public filings.



38.    By the end of 2021, SBNY's digital asset customers consisted of digital asset exchanges (44%), stable coin issuers (23%), mining operations (9%), and digital custody platforms, digital lenders, and other businesses related to the digital asset industry (24%). Signature banked many of the largest crypto exchanges and trading platforms, including FTX.

39.    Cryptocurrency exchanges were particularly valuable clients to Signature, as they represented hubs of the cryptocurrency industry and brought in significant non-interest bearing deposits to the Bank. Illustrating this, despite that there were relatively few exchanges relative to other participants in the digital asset industry, by the end of 2021, Signature had $3.4 billion in deposits from blockchain technology and digital mining companies, $4.5 billion from over-the-counter (OTC) desks and institutional traders, $6.9 billion from stablecoin issuers, and *$14 billion* from exchanges.

40.    As discussed in more detail below, rather than stop accepting digital asset-related deposits when the Bank reached its internal 10% concentration limit for digital asset deposits (*i.e.*, a policy under which digital asset deposits could not exceed 10% of the Bank's total assets), rather than turn away more deposits, Defendants chased them, increasing the limit without performing proper analyses and stress testing.

**D.      The Individual Defendants Were Enriched by Driving Crypto Deposits at Signature**

41.      The Individual Defendants had a strong motive to chase deposit growth at all costs. By doing so, each stood to cash in on his lucrative incentive-based compensation package and Long-Term Incentive ("LTI") plan, which were dramatically adjusted in 2019 when the Bank's Board of Directors altered the compensation plan of the Bank's executive officers.

42.      Prior to 2019, executive compensation was tied to the Bank achieving pre-set targets for return on equity, return on assets, and pre-tax earnings growth. However, in 2019, the Bank began using a new set of performance metrics to judge the performance of its executive officers. Namely, the Bank adopted "deposit growth" as a core driver of bonuses. Under this revised plan, the Individual Defendants operated under both short- and long-term incentive-based compensation plans that enriched them if the Bank hit "Actual Deposit Growth" goals. From 2020 to 2022, at least half of the LTI plan was triggered by the deposit growth described above.

43.      Each of the Individual Defendants made significant money under the new LTI plan.

44.      For example, Defendant DePaolo earned nearly $4 million in Performance Share Units (PSUs[3]); over $2 million in restricted stock; and over $975,000 in cash payouts as a result of rapidly-growing deposits, including uninsured crypto deposits. In 2021, DePaolo earned more than $8.9 million in total compensation, including more than $4.6 million in cash income.

45.      Defendant Shay earned over $2.5 million in PSUs; nearly $1.3 million in restricted stock; and approximately $600,000 in cash payouts. In 2021, Shay earned more than $5.1 million in total compensation, including more than $2.6 million in cash income.

46.      Defendant Howell earned over $1.6 million in PSU; nearly $850,000 in restricted stock, and approximately $420,000 in cash payouts. In 2021, Howell earned more than $3.7 million in total compensation, including more than $2 million in cash income.

47.      In 2021, Defendant Wyremski earned more than $725,000 in total income, and more than $595,000 in cash income.

---

[3] PSUs are a type of equity-based compensation typically granted to executives and senior managers, which are convertible into company shares.

### III.    THE FTX FRAUD, THE FALLOUT, AND THE COLLAPSE OF SBNY

48.    Until November 2022, FTX was one of the largest cryptocurrency exchanges in the world. Its spectacular implosion has been widely publicized, and several individuals involved pleaded guilty to or have been convicted of wire fraud, money laundering, and other financial crimes.

49.    At the heart of the FTX fraud was the misappropriation of customer deposits intended for the FTX cryptocurrency exchange into bank accounts controlled by Alameda Research LLC ("Alameda"), a cryptocurrency hedge fund sharing common ownership with FTX, where the customer deposits were then embezzled.

50.    At the helm of the scheme was Samuel Bankman-Fried, the co-founder and majority owner of both Alameda and FTX. From FTX's inception in May 2019, through the time FTX collapsed and entered bankruptcy on November 11, 2022, Bankman-Fried and his associates improperly diverted customer assets to Alameda, which used the funds to make bad bets on cryptocurrencies; to give billions in "loans" to Bankman-Fried and other insiders to fund political donations and lavish lifestyles; and to acquire failing crypto businesses in bad deals, hoping to prop up the crypto industry.

51.    As alleged more fully below, one of the primary ways in which Bankman-Fried and his associates accomplished this was by directing FTX customers to wire or otherwise deposit fiat currency into bank accounts held and controlled by Alameda. Defendants knew about and facilitated these improper actions.

**A.    In October 2017, Bankman-Fried and Wang Form Alameda Research as a Cryptocurrency Hedge Fund**

52.    After graduating from MIT, Bankman-Fried worked for the global trading firm, Jane Street, where he learned a trading strategy called arbitrage, which seeks to exploit price gaps in markets.

53.    By 2017, the cryptocurrency industry was booming, and there were several private digital asset exchanges. Bankman-Fried—who had by then quit his job at Jane Street—noticed that Bitcoin was selling for substantially more money in Japan than in the U.S. and thought he could exploit the 10% price gap. As a 25-year-old, in October 2017, Bankman-Fried and then 24-year-old, Zixiao "Gary" Wang thus co-

founded Alameda as a quantitative trading firm specializing in digital assets, sometimes known as a crypto hedge fund.

54.    Alameda was headquartered at 2000 Center Street, Suite 400, in Berkeley, California (the "Center Street Address"), which is in Alameda county, the namesake of the company. Bankman-Fried chose the name Alameda specifically to avoid attention.

55.    At first, Bankman-Fried, who was Alameda's CEO, was responsible for trading operations while Wang handled engineering and programming functions. Until Alameda declared bankruptcy on November 11, 2022, Bankman-Fried and Wang were the sole equity owners, with 90% and 10% of the ownership, respectively.

56.    Alameda maintained one or more bank accounts at Signature Bank and had a Signet account.

57.    Initially, Alameda was focused on leveraging Japan's Bitcoin premium. At the peak of this strategy, it was sending $15 million between the two countries daily, generating $1.5 million in daily profits. That gap lasted for only a few weeks, but its exploitation earned Alameda about $20 million.

58.    As crypto rapidly expanded in popularity and began attracting professional investors, arbitrage opportunities became less lucrative or disappeared. Partly in response to the declining arbitrage opportunities, and partly as a way to reinvest Alameda's profits, in late 2018, Bankman-Fried and his associates decided to launch a cryptocurrency exchange, and Alameda began shifting its focus from arbitrage to market making.

**B.    In May 2019, Bankman-Fried and Wang Form the Cryptocurrency Exchange, FTX**

59.    By the start of 2019, Bankman-Fried, Wang, and a third man named Nishad Singh were working to build their own cryptocurrency exchange. After four months of coding, they ultimately co-founded FTX Trading Ltd., an Antigua and Barbuda limited corporation which, through a child company called FTX Digital Markets Ltd. ("FDM") did business as FTX.com, sometimes referred to as the FTX International platform.

60.    FTX.com launched in May 2019 as a global crypto asset trading platform, although persons in some countries, including the United States, were prohibited from using the platform. Later, in August 2020, Bankman-Fried formed FTX US as an exchange platform available to U.S. customers.

61.    FTX initially shared offices in Berkeley and personnel with Alameda, and represented itself to be a San Francisco company, as shown in screenshots below from mid- to late 2019, including FTX's Facebook page.







62.    For some time after FTX was formed, Bankman-Fried's Twitter profile identified him as the

CEO of both FTX and Alameda.



63.    For some time after FTX was formed, Bankman-Fried tweeted about and promoted it from his @SBF_Alameda account, for example, the below July 24, 2019 and September 14, 2019 tweets.





64.    Similarly, as shown below, FTX's twitter profile stated that it was a "Crypto Derivatives Exchange by Alameda Research."



65.     Alameda's website likewise made clear this connection. As shown below, the header of Alameda's website included a prominent link to FTX. Moreover, a button "Trade with Us" located on the website linked to FTX's website.



66.     In June 2019, FTX published a white paper to help attract potential investors. On the first page, under the header, "Track Record of Proven Success," it stated:

> FTX is backed by Alameda Research, a ~$100million AUM quantitative cryptocurrency trading firm. Within a year, Alameda Research became the largest liquidity provider and market maker in the space. Alameda trades $600 million to 1 billion a day, accounts for roughly 5% of global volume and is ranked 2nd on the BitMEX leaderboard.

67.     Since at least 2020, Alameda maintained bank accounts at Signature and was a Signet user.

68.     Bankman-Fried was the ultimate decisionmaker at FTX from its inception until he resigned on November 11, 2022, and maintained tight control over the operation, delegating little to others. As a result, he was highly-involved in its operations, for example, sometimes personally answering even minor support requests from users.

69.     FTX offered its customers a number of services, including:

a.      The *spot market*, a trading platform through which customers could trade crypto assets with other FTX customers in exchange for fiat currency or other crypto assets.

b.      *Spot margin trading services*, allowing FTX customers to trade using assets they did not have (*i.e.*, to trade on margin) by posting collateral in their FTX accounts and borrowing crypto assets through the spot market on the FTX platform. FTX also allowed customers to lend their crypto assets to other FTX customers who would then use those crypto assets to spot trade.

c.      An *OTC desk*, or off-platform portal that enabled customers to connect and request quotes for spot crypto assets, and to conduct trades.

d.      *Futures trading*, for the purchase and sale of crypto futures contracts.

70.     A screenshot of the FTX web-based platform appears below.



71.     Some of FTX's services were also available through an API, which institutional investors often used.

72.     Trading on the platform was largely accomplished through an internal FTX order book that matched buyers with sellers.

73.     Signing up for FTX was simple. FTX did not require its users to validate their identities by providing official identification documents. In fact, as shown in the below screenshot of FTX's website in around late 2019, to sign up, an FTX user was not required to provide even the most basic identifying information, such as name, date of birth, address, or other identifiers.



74.     As a result, users were able to create and fund FTX accounts with nothing more than an email address. This meant accounts on FTX could easily be opened anonymously, including by customers in the United States.[4] Moreover, users were able to make unlimited deposits and trades with up to 100x leverage, though they could only withdraw $1,000 over the lifetime of the account. While this rule was designed to combat money laundering, it did not prevent users from laundering unlimited funds from one account to another to bypass the $1,000 limit.

---

[4] IP address-based restrictions are easily circumvented using a Virtual Private Network (VPN). Moreover, FTX introduced a mobile app in 2020 that did not restrict U.S. customers' use. Accordingly, approximately 2% of the traffic on FTX was from U.S. customers who were purportedly prohibited from using the platform.

75.     Furthermore, to double the withdrawal limit to $2,000 on a daily basis, a user needed only to complete FTX's "tier 1" KYC requirements, which, as shown in the below screenshot from an FTX document, were minimal: just an email, name, and country of residence.

FTX has three different tiers of KYC requirements.  Please see below for a summary of the levels:

| Tier | Requirements | Withdrawal Limits |
|---|---|---|
| 0 | Email | $1000 USD lifetime |
| 1 | Email<br>Name<br>Country of residence and region/province | $2000 USD Daily |

76.     FTX did not verify the information provided by users who completed its tier 1 KYC process, which meant U.S. consumers could easily register, and any user could easily register multiple accounts.

77.     In effect, FTX had virtually no AML or KYC processes or policies in place, or the existing policies lacked any meaningful enforcement.

78.     FTX's services were rendered pursuant to Terms of Service that were publicly-available on FTX's website, FTX.com.[5] The Terms of Service provided that, "In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account."

79.     Regarding fiat, the Terms of Service provided that "the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods," and "Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account." However, this "E-MONEY IS NOT LEGAL TENDER." Nevertheless, "You may redeem all or part of any E-Money held in your Account at any time . . . . Unless agreed otherwise, funds will be transferred to the bank account you have registered with us."

---

[5] *See* FTX Terms of Service (May 13, 2022), attached hereto as <u>Exhibit 1</u>, and incorporated by reference into this Complaint.

80.     The Terms of Service further provided that:

All Digital Assets are held in your Account on the following basis:

(A)     Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading . . . .

(B)     None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)     You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

81.     FTX also posted on its website a document titled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," in which it represented that FTX "segregates customer assets from its own assets across our platforms," and maintains "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

82.     An August 2021 policy document of FDM, the operational entity of FTX, further stated:

FDM has a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds. This includes customer assets that may be held by third party service providers. **FDM will ensure that**:

• Customer assets (both fiat and virtual assets) are segregated from its own assets;

• Customer assets (both fiat and virtual assets) will be clearly designated and easily identifiable;

• All third-party service providers are aware that customer funds do not represent property of FDM and are therefore protected from third-party creditors; and

• All third-party providers are aware that customer assets are held in trust.

Regarding customer fiat assets, FDM will maintain customer accounts with a regulated credit, e-money or payment institution that is acceptable to the Securities Commission of The Bahamas (SCB). Customer accounts will be designated as such, and the monies contained therein will be appropriately ring-fenced and protected from claims against FDM.

Customer monies will be appropriately ring-fenced to protect from:

• The unlikely event FDM becomes insolvent;

• The use of customer monies being used to benefit others; and

• FDM using customer monies to finance its own operations. Written notice will be provided to the relevant regulated credit, e-money, or payment institution to clarify that the assets contained are held by us on trust for our customers and they are not entitled to combine the account any other account, or to exercise any right of set-off or counterclaim against the money in those accounts, in respect of any debt owed by us.

**C.      From Its Inception, FTX Diverted to Alameda and Commingled FTX Customer Funds**

83.      When FTX launched, it did not have the requisite bank accounts to accept and hold customer funds, in part because cryptocurrency exchanges are subject to more stringent due diligence requirements than are other industry participants, like hedge funds. As a result, and at Bankman-Fried and FTX's direction, from the start of FTX's operations in around May 2019 and continuing into 2022, FTX customers deposited fiat currency—billions of dollars' worth—into bank accounts that were controlled instead by Alameda. Wiring instructions to facilitate these transfers were publicly-available on FTX's website.

84.      Once funds intended for customers' FTX accounts were deposited into Alameda bank accounts, FTX personnel monitoring the Alameda bank accounts would manually credit the depositing customer's FTX account on the FTX internal ledger system using the "NONLEGAL TENDER" that FTX invented for this purpose, its so-called "E-Money." Because Signature is the largest holder of reserves for the world's largest stablecoin, Circle's USDC, which is integrated into Signet—and because stablecoins like USDC or Tether's USDT provide the same function but have actual value—the obvious purpose of E-Money was for FTX to avoid the transfer of value from Alameda's accounts to its own.



85.      Indeed, these E-money credits on customers' FTX accounts were notional only. While customers accessing their FTX accounts would be able to observe on the exchange's website or mobile app

that their funds had been posted to their FTX accounts—and believed they were then effectively segregated for their benefit per the FTX Terms—the funds in fact remained in Alameda's accounts.

86.    However, these customer funds received by Alameda were *not* placed into accounts designated as being "for the benefit of" (FBO) FTX customers, or otherwise segregated.

**D.    In August 2020, Bankman-Fried Formed North Dimension to Further Facilitate the Diversion of FTX Customer Funds to Alameda**

87.    In August 2020, Bankman-Fried formed a new Delaware entity called North Dimension Inc. as a wholly-owned subsidiary of Alameda. Like Alameda, its registered address was the Center Street Address in Berkeley, California. Bankman-Fried formed the entity in an effort to hide the fact that customers were being directed to send funds to an account controlled by Alameda.

88.    Bankman-Fried opened two bank accounts for North Dimension at Silvergate Bank, in La Jolla, California. Then he and FTX, including in wiring instructions posted on the FTX.com website, began directing FTX customers to deposit funds intended for FTX into those North Dimension accounts. Bankman-Fried eventually created a fake website for North Dimension, which purported to sell electronics, but was not functional. As shown in the screenshot below, Alameda's Center Street Address was provided as North Dimension's contact information.



E.    **The Good Times**

89.    Over time, Alameda expanded its activities into a number of new digital asset business models, like yield farming—pooling crypto assets in exchange for interest or other rewards—and volatility trading. It also offered OTC trading services.

90.    From its inception, FTX relied on Alameda resources, funds, and personnel to carry out a number of core functions for the trading platform, including creating liquid submarkets for all of the products it offered, maintaining an appropriate balance of various digital assets on the exchange, and supporting FTX's peer-to-peer margin lending program.

91.    In particular, from the launch of FTX, Alameda operated as a primary market maker on the exchange. In that capacity, it acted as an always-willing buyer and seller of digital assets in order to provide sufficient liquidity and ensure an available trading counterparty to FTX customers. Over time, FTX acquired other market makers, but Alameda always remained a high-volume market maker on the platform.

92.    Assisted in part by Alameda's market making, FTX grew quickly, becoming the world's second-largest crypto exchange in just a couple short years. By June 2019, shortly after its launch, the daily volume of futures trading on FTX often exceeded $100 million. By 2020, an average of $1 billion was being traded on FTX daily. By 2021, FTX held about $15 billion in assets on its platforms and accounted for about $16 billion of transaction volume per day—about 10% of the global digital asset volume. That year, FTX made $350 million in profit, and Alameda $1 billion, with a staff of just 30.

93.    During this time, FTX and Alameda failed to observe corporate formalities, including by failing to segregate funds, operations, resources, and personnel, and by failing to properly document intercompany transfers of funds and other assets.

94.    Moreover, the entities regularly shared office space—first in Berkeley, California, then later in Hong Kong and The Bahamas—as well as systems, technology, hardware, accounts, intellectual property, communication channels, and other resources.

95.    As FTX grew, in October 2021, Bankman-Fried stepped down as CEO of Alameda, appointing as co-CEOs of Alameda then 27-year-old Caroline Ellison, who had joined Alameda as a trader

in March 2018, and 28-year-old Sam Trabucco, who had graduated from MIT with Bankman-Fried and joined Alameda in 2019.

96.    Even after stepping down, however, Bankman-Fried continued to maintain control over Alameda. For example, he retained full access to Alameda's records and databases, remained a signatory on Alameda's bank accounts, and remained an authorized trader for Alameda with certain merchants. Bankman-Fried also maintained direct decision-making authority over all of Alameda's major trading, investment, and financial decisions, exercising this authority by participating in in-person and mobile chat communications with senior personnel at Alameda, including Ellison. Moreover, while Ellison was responsible for Alameda's day-to-day operations and for making trading decisions, she frequently consulted Bankman-Fried, particularly about strategic issues and significant trades.

97.    During this time, Alameda used customer funds intended for FTX to fund its trading operations and Bankman-Fried's other ventures, such as real estate purchases and political donations. Ellison was aware of and complicit in this scheme.

98.    Alameda's multi-billion-dollar liability was reflected in an internal account in the FTX database not tied to Alameda, but instead labeled "fiat@ftx.com." Characterizing the amount of customer funds sent to Alameda as an internal FTX account had the effect of concealing Alameda's liability in FTX's internal systems. In balance sheets Ellison provided to its lenders, Alameda tracked this liability as a "loan," but did not specify that it was from FTX; and she combined it with other loans to help conceal its origin. Alameda was not required to pay interest on this "loan." During Bankman-Fried's trial, Ellison testified she had prepared seven different versions of the spreadsheet she put together for this purpose, and that Bankman-Fried had chosen his favorite.

### F.    The Crypto Winter

99.    As part of its expanding business, in around 2020 Alameda began making and managing large debt and equity investments in various companies in the digital asset industry. In 2021, Bankman-Fried directed Ellison to secure for Alameda large loans from digital asset lending platforms, so that Alameda could rapidly increase the size and variety of its digital asset industry investments. These loans were used to

fund venture investments, and for Bankman-Fried's personal use. Some of the loans, however, permitted the lenders to demand repayment at any time.

100.    By early 2022, Alameda had invested several billion dollars in directional, unhedged, illiquid, and long-term investments. To fund these activities, it had relied on billions of dollars of these loans, traditional bank lines of credit, and its unlimited borrowing abilities on FTX, including its access to customer funds.

101.    Alameda funded these activities in part through an account held at Signature Bank in the name of Maclaurin Investments Ltd. ("Maclaurin"). Maclaurin was organized and is headquartered in the Seychelles. It is 100% owned by Alameda Research Ltd., a British Virgin Islands limited corporation ("Alameda BVI"), which itself is 100% owned by Alameda.

102.    In early 2022, prices of Bitcoin and other cryptocurrencies began dropping precipitously in what is now known as the "crypto winter." Whereas Bitcoin had reached an all-time high just over $67,000 per coin on November 9, 2011, by June 2022, it had dropped to below $20,000 per coin.

103.    As crypto prices were dropping precipitously, Bankman-Fried, through various Alameda and FTX-related entities, entered into a series of transactions with struggling members of the cryptocurrency industry, providing credit to or taking over numerous failing firms.

104.    At the same time, in May 2022, several lenders demanded repayment from Alameda, whose assets were similarly plummeting in value. Because it did not have sufficient assets to cover these obligations, Bankman-Fried directed Alameda, via Ellison, to draw on its "line of credit" from FTX, which was funded by its spot market customers. As a result, billions of dollars of customer funds were diverted to Alameda and used to repay its third-party loan obligations.

105.    Even after this—and despite Alameda having no realistic prospects of raising capital to pay off its "line of credit"—in the summer of 2022, Bankman-Fried continued to direct Alameda, via Ellison, to draw on the "line of credit," diverting hundreds of millions of dollars more to make "loans" to Bankman-Fried and other FTX insiders, and to fund additional venture investments. At Bankman-Fried's trial, Ellison testified that, at the time, she "was in sort of a constant state of dread" and "lived in fear" of the prospect that customers would pull their money from FTX en masse.

106.    Between March 2020 and September 2022, Bankman-Fried executed promissory notes for loans from Alameda totaling more than $1.338 billion. In two instances, Bankman-Fried was both the borrower in his individual capacity, and lender in his capacity as CEO of Alameda. Singh and Wang also borrowed $554 million and $224.7 million, respectively, by executing promissory notes with Alameda in 2021 and 2022.[6] These loans were poorly documented.

107.    Between 2020 and 2022, Alameda, FTX, and Bankman-Fried made at least 117 venture investments. The below graphic illustrates Alameda Research's venture portfolio as of November 28, 2021.



108.    In March and September 2022, using diverted customer funds, FTX made two $100 million venture investments through a British Virgin Islands entity called FTX Ventures Ltd., which had a bank account at Signature Bank.

109.    Because their venture activities in 2022 were largely undertaken in hopes of propping up an industry in turmoil, Alameda and FTX's deals were hastily made without adequate due diligence, and on poor terms. Bankman-Fried knowingly entered into these bad deals because he believed that, to dig Alameda

---

[6] The funds borrowed under these notes in Wang's name were not intended for his use but were instead used by Bankman-Fried for other purposes, including additional venture investments. Nevertheless, Wang used approximately $200,000 for his own purposes.

out of its hole, it was necessary to lift up the entire industry. For example, just days before Voyager Digital declared bankruptcy, and before it could tap the full loan, Alameda agreed to extend a $485 million line of credit to the company. At the time, Alameda owed money to Voyager and was one of its biggest shareholders.

110.     Between March 2020 and November 2022, Bankman-Fried and FTX also made $93 million in political donations and purchased approximately $253 million worth of real estate in The Bahamas.



### G.     The November 2022 Collapse

111.     The collateral Alameda had on deposit with FTX included a large position in illiquid digital assets, most notably in the "FTT" token, the native crypto asset of FTX. This compounded the risk to FTX's customers because FTX valued this Alameda collateral at trading prices. But because FTX and Alameda owned the majority of the FTT tokens that FTX had minted, and only a small portion were in circulation, the collateral was not worth the value assigned: the market for the tokens was illiquid and if Alameda or FTX had tried to sell Alameda's holdings, their price—and the value of Alameda's collateral on FTX—would have cratered.

112.     On November 2, 2022, crypto publication CoinDesk released a report finding that, even though FTX and Alameda were ostensibly separate, Alameda's balance sheet was mostly comprised of FTT.

It appeared that, following massive losses Alameda had sustained in the second quarter of 2022, FTX was lending Alameda money against these illusory assets. The report thus called FTX's liquidity into serious question.

113.    Shortly after these revelations, FTX's primary competitor, the cryptocurrency exchange Binance, announced it was liquidating $530 million worth of FTT tokens. Customers raced to withdraw funds from FTX, with an estimated $6 billion withdrawn over the course of 72 hours, as the value of its FTT token plunged 32% in the same timeframe.

114.    On Tuesday, November 8, 2022, FTX made a surprise announcement that Binance would buy FTX, effectively bailing it out. The following day, however, Binance announced it was walking away from the tentative deal after performing due diligence and finding that customer funds had been mishandled. The price of FTT plunged on this news.



115.    The following morning, November 9, 2022, Ellison held an "all-hands" meeting with Alameda's staff. She stated that, earlier that year, in response to an accounting or bookkeeping problem, she, Bankman-Fried, and Wang had decided to use FTX customer funds for Alameda; that FTX had always allowed Alameda to borrow customer funds; and that FTX did not require collateral from Alameda, though in practice the collateral was Alameda's FTT.

116.    The following morning, November 10, 2022, Reuters reported that, after Alameda sustained $500 million in losses in May and June 2022, Bankman-Fried had transferred at least $4 billion from FTX

to Alameda without telling anyone, "fearing the news would leak," and "lent more than half of its $16 billion in customer funds to Alameda in total, with Bankman-Fried telling an investor . . . that Alameda owes FTX about $10 billion."

### H.    The Fallout

117.    On Friday, November 11, 2022, Bankman-Fried resigned as FTX's CEO. FTX then filed for Chapter 11 bankruptcy. Alameda and 132 other related companies also moved for bankruptcy and joint administration.

118.    On December 13, 2022, the United States Securities and Exchange Commission (SEC) filed a civil complaint against Bankman-Fried for his violation of the Securities Act and Exchange Act by virtue of his role in defrauding FTX investors, styled *SEC v. Samuel Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.).

119.    On December 13, 2022, the United States Commodities Futures Trading Commission (CFTC) filed a civil complaint against Bankman-Fried, FTX, and Alameda, for their violations of the Commodity Exchange Act, styled *CFTC v. Samuel Bankman-Fried, FTX Trading Ltd d/b/a FTX.com, & Alameda Research LLC*, No. 22-cv-10503 (S.D.N.Y.).

120.    On or around December 13, 2022, Bankman-Fried was indicted on eight felony counts. The charges included counts for wire fraud on customers and lenders and related conspiracy charges; conspiracy to commit securities and commodities fraud; conspiracy to commit money laundering; and conspiracy to violate U.S. campaign finance laws. *See United States v. Samuel Bankman-Fried a/k/a "SBF,"* No. 22-CR-673 (S.D.N.Y.).

121.    On or around December 14, 2022, Ellison agreed to plead guilty to seven felonies that carry a combined maximum 110 years' imprisonment. The charges include counts for conspiracy relating to wire fraud on customers and lenders, securities and commodities fraud, and money laundering.

122.    On or around December 14, 2022, Wang agreed to plead guilty to four felonies that carry a combined maximum 50 years' imprisonment. The charges include counts for conspiracy relating to wire fraud on customers and lenders, and securities and commodities fraud.

123.    On December 21, 2022, the SEC filed a civil complaint against Ellison and Wang for their violations of the Securities Act and Exchange Act by virtue of their roles in defrauding FTX investors, styled *SEC v. Caroline Ellison & Zixiao "Gary" Wang*, No. 22-cv-10794 (S.D.N.Y.).

124.    On November 2, 2023, after a 15-day trial, Bankman-Fried was found guilty on seven counts of fraud and conspiracy (the government had elected not to pursue the campaign finance violations). His sentencing hearing is scheduled for March 28, 2024 and he faces up to 110 years in prison.

## IV.    DEFENDANTS' ACTIONS AFTER THE FTX COLLAPSE

125.    In a November 15, 2022 press release, Defendants said their "deposit relationship with FTX and their related companies is less than 0.1 percent of the Bank's overall deposits as of November 14, 2022," and noted that it had reported "102.8 billion in deposits as of September 30, 2022." Thus, Defendants have admitted that at least approximately $100 million of deposits in its possession shortly after FTX entered bankruptcy relate to "FTX and their related companies" (though it is unclear whether that includes Alameda).

126.    During a December 6, 2022 Financial Services Conference hosted by Goldman Sachs, Defendant DePaolo explained that, after "looking at our [digital asset] businesses" and "the deposits from those businesses," Signature "do[es]n't want to be beholden to any one industry or any one individual client," so that it decided to "limit the amount of deposits not only on a global basis but on an individual client basis."

127.    Asked about the state of Signature's deposits, DePaolo said at the Goldman Sachs event:

Right now, we're at $7.3 billion, but of that, $6.1 billion is crypto, and that's purposeful because we actually had higher balances a few weeks ago when FTX happened. But right now, we're going to have probably somewhere between $8 billion and $12 billion, and most of that crypto, that will be going away.

128.    During the conference, Howell, explained Signature's abrupt policy change in the wake of FTX's collapse:

So as Joe said, given the issues that we've seen in the cryptocurrency space as of late in particular, it's really given us an opportunity as [to] what we're doing there. We're going to have—we're really focused on our concentration levels in deposits. We're going to lower them to at least under 20%, most likely down to under 15% and keep them there as a dollar level as we grow the rest of our institution.

We're going to put in at least—no 1 client can have more than 2% in deposits. We're going to, over time, look to lower that as well. So we're looking to get more granular in the space, and

we're looking to basically limit it to about—definitely no more than 20%. We're looking at really bringing it down to under 15%. We're probably pretty close there.

What does that mean? That means we're going to exit about $8 billion to $10 billion worth of deposits in that space, which we can easily cover through cash and borrowings. So it's going to be a little bit more expensive in the short term. But as we replace those deposits—lower those borrowings with lower core deposits, it will ultimately be a far better use of capital than what we've seen today.

129.    Howell was asked whether this should be read as Signature's exit from the digital space. Howell responded, "we're going to be involved but we're going to be involved in a much more thoughtful manner moving forward."

130.    To replace these reduced deposits, Signature took approximately $10 billion in advances from the Federal Home Loan Bank of New York.

131.    During a January 2023 earnings call, Defendant DePaolo was asked whether Signature would lend digital asset deposits out since "the original appeal of these deposits was it would be a lower-cost funding option," but that "is not necessarily proving to be the case." DePaolo responded, "in the short term, we clearly don't have any evidence or any past history that gives us a comfort level that we should do something long term with those deposits. So, we're going to keep them short for now."

132.    Asked about Signature's commitment to the cryptocurrency industry, DePaolo said:

Having this FTX situation clearly put a lack of confidence in that ecosystem. Now, what we need to do is to get regulation, get competence back in the system, and we can go from there. . . . You know, every major bank—maybe not every major bank, but many major banks are in the space, maybe more internationally than domestically, but they're all there. And what really shook the confidence of the markets was, as I said, FTX, almost Bernie Madoff-like. And that when Bernie Madoff happened, that shook the markets—it shook the markets. Again—I'll say it again: We need regulations. So, we need the regulators and Congress to get on the same page.

133.    During the call, DePaolo claimed that Signature's extensive KYC and AML procedures had simply failed in the case of Bankman-Fried, Alameda, and FTX, saying "With the FTX, it wasn't a matter of BSA/AML. Everyone thought that he was legitimate and he ended up being very Madoff-like. So, I don't think anyone could say that they knew that and we catch it." [sic] DePaolo later again claimed, "FTX is not BSA/AML. It was a Bernie Madoff-like situation that no one really thought that Sam was a bad asset."

134.     Approximately three months later, on March 9, 2023, a high-profile short seller who predicted the fall of FTX and Silvergate, Marc Cohodes, alleged SBNY was involved with FTX and Silvergate in a money laundering scheme using Signet, and claimed that 25% of SBNY's deposits were related to the cryptocurrency sector. Cohodes warned that SBNY lacked basic controls, citing "Signature in April 2020 mak[ing] a $370,000 pandemic assistance loan to Alameda Research," and noting that "SBNY has played a central role as a facilitator, even if unwitting, for countless illegal crypto transactions."[7] Cohodes' Twitter audio conversation was widely reported the following day, on March 10, 2023, beginning a bank run on Signature.[8]

135.     Two days later, on March 12, 2023, the NY DFS closed Signature Bank and appointed the FDIC, the Bank's primary federal regulatory, as Receiver.

136.     As of December 31, 2022, SBNY had total deposits of $88.6 billion and total assets of $110.4 billion. It was the 29th largest bank in the country, and its failure constituted the third-largest bank failure in United States history. Its failure has cost the FDIC's Deposit Insurance Fund an estimated $2.5 billion.

137.     Defendants DePaolo and CFO Wyremski have been alleged to have committed fraud by claiming the bank was "financially strong" just three days before it was shut down.

## V.    DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE FTX FRAUD

138.     From at least June 2020, Defendants had actual knowledge of the FTX fraud, which they acquired through, among other things by (i) directly observing and processing suspicious funds transfers through Signet—including transfers Plaintiffs expressly told Signature were for FTX, which Signature allowed to be transferred to Alameda anyway—and through other Alameda and FTX accounts at Signature Bank; (ii) performing enhanced due diligence on Alameda and FTX, first during their onboarding and then during ongoing monitoring; and (iii) performing enhanced blockchain analysis. In addition, Defendants' closeness to and expertise regarding the cryptocurrency industry, and the numerous red flags present, further confirm Defendants' actual knowledge.

---

[7] *See* "Short seller warned US regulator about Signature Bank in January," Financial Times (Mar. 20, 2023), *available at* https://www.ft.com/content/8dfade4a-3e16-454c-9529-1c46263a20be.

[8] *Id.* at 15.

### A.    By Virtue of Carrying Out Due Diligence and Ongoing Monitoring Obligations

139.    The primary purpose of the U.S. system of banking supervision is to ensure the safety and soundness of banks in order to protect depositors, the FDIC deposit fund, and the financial system generally.

140.    The Currency and Foreign Transactions Reporting Act of 1970—commonly referred to as the Bank Secrecy Act ("BSA")[9]—was passed to, among other things, "prevent the laundering of money and the financing of terrorism," "facilitate the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "protect the financial system of the United States from criminal abuse." *See* 31 U.S.C. § 5311.

141.    As a "bank," Signature had various obligations under the BSA. As the chief executives and officers of Signature, Defendants were responsible for ensuring the Bank's compliance.

142.    First, Signature was a "domestic financial institution," and specifically a "Bank," as defined by the BSA and its implementing regulations.[10] As such, it was required to comply with BSA regulations applicable to banks. *See generally* 31 C.F.R. § 1020 ("Rules for Banks").

143.    The BSA and its implementing regulations required Signature to develop, implement, and maintain an effective AML program reasonably designed to prevent Signature from being used to facilitate money laundering and the financing of terrorist activities. *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1020.210(a). This included several things.

144.    First, Defendants must have:

establish[ed] a due diligence program that includes appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures and controls that are reasonably designed to

---

[9] Pub. L No. 91-508, § 202, 84 Stat. 1114 (enacted Oct. 26, 1970) (codified as amended at 31 U.S.C. §§ 5311-5314, 5316-5366 and 12 U.S.C. §§ 1829b, 1951-1959); *see* Pub. L. No. 107-56, the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (USA PATRIOT Act) (enacted Oct. 26, 2001) & Pub. L. No. 116-283, §§ 6001-6511, the "Anti-Money Laundering Act of 2020" (AMLA) (enacted Jan. 1, 2021). Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

[10] *See* 31 U.S.C. § 5312(a)(2) & (b)(1) (defining "financial institution" and "domestic financial institution"); 31 C.F.R. §§ 1010.100(d) (defining "bank") & 1010.100(t) (defining "Financial Institution").

enable the covered financial institution[11] to detect and report, on an ongoing basis, any known or suspected money laundering activity conducted through or involving any correspondent account[12] established, maintained, administered, or managed . . . for a foreign financial institution.

31 C.F.R. § 1010.610(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This includes: (a) assessing the money laundering risk presented by any foreign financial institution correspondent account (which includes Alameda and FTX accounts, *see* 31 C.F.R. § 510.309) based on its business and the markets it serves, anticipated activity, nature and duration of its relationship with the bank, the regulatory regime of the country in which it is located, and information known or available to the bank about its anti-money laundering record; and (b) applying risk-based procedures and controls designed to detect money laundering activity, including through a periodic review of account activity sufficient to determine its consistency with expected activity.

145.    Second, Signature must have "maintain[ed] a due diligence program that includes policies, procedures, and controls that are reasonably designed to detect and report any known or suspected money laundering or suspicious activity conducted through or involving any private banking account that [they] established, maintained, administered, or managed," *see* 31 C.F.R. § 1010.620(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This program must have been:

designed to ensure, at a minimum, that the financial institution takes reasonable steps to: (1) Ascertain the identity of all nominal and beneficial owners of a private banking account; (2) Ascertain whether any person identified under paragraph (b)(1) . . . is a senior foreign political figure; (3) Ascertain the source(s) of funds deposited into a private banking account and the purpose and expected use of the account; and (4) Review the activity of the account to ensure that it is consistent with the information obtained about the client's source of funds, and with

---

[11] "Covered financial institution means: (1) For purposes of § 1010.610 and 1010.620: (i) A bank required to have an anti-money laundering compliance program under the regulations implementing 31 U.S.C. 5318(h), 12 U.S.C. 1818(s), or 12 U.S.C. 1786(q)(1)[.]" 31 C.F.R. § 1010.605(e).

[12] "The term correspondent account means: (i) For purposes of § 1010.610(a), (d), and (e), an account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution; and (ii) For purposes of §§ 1010.610(b) and (c), 1010.630 and 1010.670, an account established for a foreign bank to receive deposits from, or to make payments or other disbursements on behalf of, the foreign bank, or to handle other financial transactions related to such foreign bank." 31 C.F.R. § 1010.605(c)(1).

the stated purpose and expected use of the account, as needed to guard against money laundering, and to report, in accordance with applicable law and regulation, any known or suspected money laundering or suspicious activity conducted to, from, or through a private banking account.

*Id.* § 1010.620(b).

146.    Third, Signature's AML program must have included:

at a minimum: (i) A system of internal controls to assure ongoing compliance; (ii) Independent testing for compliance to be conducted by bank personnel or by an outside party; (iii) Designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance; (iv) Training for appropriate personnel; and (v) Appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to: (A) Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and (B) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information. . . . [which] include[s] information regarding the beneficial owners of legal entity customers[.]

*Id.* § 1020.210(a)(2).[13]

147.    By virtue of its offering Signet to its customers, Signature was also a "money services business," and specifically a "money transmitter," as defined by the BSA and its implementing regulations.[14]

---

[13] "Legal entity customer means a corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account." *Id.* § 1010.230(e).

[14] *See* 31 C.F.R. § 1010.100(ff) (Defining "money services business" as "a person wherever located doing business . . . in one or more of the capacities listed in paragraphs (ff)(1) through (ff)(6) of this section."); *id.* § 1010.100(ff)(5)(i) (Defining "money transmitter" as:

(A) A person that provides money transmission services. The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or (B) Any other person engaged in the transfer of funds.).

The section includes a number of exceptions, *see id.* § 1010.100(ff)(5)(ii), but none apply to Signature. *See also* U.S. Dep't of Treasury, Fin. Crimes Enforcement Network, FIN-2014-R002, "Application of FinCEN's Regulations to Virtual Currency Software Development and Certain Investment Activity," at 2-3 (Jan. 30, 2014) (Explaining that the guidance provided in FIN-2013-G001, titled "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies" (Mar. 18, 2013), "makes clear that an administrator or exchanger of convertible virtual currencies that (1) accepts and transmits a

As such, Defendants were required to ensure Signature comply with BSA regulations applicable to money transmitters. *See generally* 31 C.F.R. § 1022 ("Rules for Money Services Businesses").

148.    In addition to developing, implementing, and maintaining an effective anti-money laundering program, similar to its obligation as a bank, *see* 31 C.F.R. §§ 1022.210(a) & 1022.600, applicable regulations required Signature to: (a) integrate its compliance procedures into any automated data processing systems it uses (such as Signet); (b) designate a person to assure day-to-day compliance with the program and relevant regulations; and (c) provide for an independent review of the program. *See* 31 C.F.R. § 1022.210(d).

149.    In addition, as a New York state-chartered commercial bank, Signature was subject to both New York's Banking Law ("BL") and Financial Services Law ("FSL"). NY DFS implements and enforces these laws.[15] Under these laws, NY DFS is empowered to, *inter alia*, "ensure the safe and sound conduct of [banking] business[es] . . . and protect the public interest and interest of depositors, creditors, shareholders and stockholders"[16]; and to "ensure the continued solvency, soundness, and prudent conduct of the providers of financial products and services," "encourage high standards of honesty, transparency, fair business practices and public responsibility," and "promote the reduction and elimination of fraud, criminal abuse and unethical conduct by, and with respect to, financial services institutions and their customers."[17]

150.    Applicable regulations appear in titles 3 (Banking) and 23 (Financial Services) of the New York Codes, Rules, and Regulations ("NYCRR"). Signature fell within the definition of—and was subject to regulations covering—both Banks,[18] and Virtual Currency Businesses.[19] These laws generally require Signature to comply with the Federal AML regulations.

---

convertible virtual currency or (2) buys or sells convertible virtual currency in exchange for currency of legal tender or another convertible virtual currency for any reason . . . is a money transmitter under FinCEN's regulations, unless a limitation or exemption from the definition applies to the person" pursuant to 31 C.F.R. § 1010.100(ff)(5)(ii).

[15] *See* BL Ch. 2, Art. 2 § 10; FSL § 102.

[16] BL Ch. 2, Art. 2 § 10.

[17] FSL § 201(b).

[18] *See* 3 NYCRR §§ 2.1 & 2.11.

[19] *See* 23 NYCRR §§ 200.1 *et seq.* Virtual Currency Business Activity means the conduct of any one of the following types of activities involving New York or a New York Resident: (1) receiving Virtual Currency

151.    NY DFS's approval of Signet was based on stringent requirements including to: (i) Implement, monitor and update effective risk-based controls and appropriate BSA/AML and OFAC[20] controls to prevent money laundering or terrorist financing; (ii) Implement, monitor and update effective risk-based controls to prevent and respond to any potential or actual wrongful use of virtual currency, including but not limited to its use in illegal activity, market manipulation, or other similar misconduct as required by NY DFS's February 7, 2018, "Guidance on Prevention of Market Manipulation and Other Wrongful Activity";[21] (iii) Comply with NY DFS's transaction monitoring and cybersecurity regulations; and (iv) Maintain policies and procedures for consumer protection and to promptly address and resolve customer complaints. Thus, to the extent it would not already have been considered one, the NY DFS authorization effectively made Signature a Virtual Currency Business ("VC Entities") subject to the regulations promulgated under 23 NYCRR Part 200.

152.    NY DFS's Guidance on Wrongful Activity "emphasizes that: 1) VC Entities are required to implement measures designed to effectively detect, prevent, and respond to fraud, attempted fraud, and similar wrongdoing; and 2) market manipulation is a form of wrongdoing about which VC Entities must be especially vigilant, given that such manipulation presents serious risks both to consumers and to the safety and soundness of financial services institutions."

153.    The specific regulations that governed Signature as a Virtual Currency Business are even more detailed. First, Signature was required to keep detailed records of all transactions, including amount,

---

for Transmission or Transmitting Virtual Currency; (2) storing, holding, or maintaining custody or control of Virtual Currency on behalf of others; (3) buying and selling Virtual Currency as a customer business; (4) performing Exchange Services as a customer business; or (5) controlling, administering, or issuing a Virtual Currency. *See* 23 NYCRR § 200.2(q). The "signet" tokens used on Signature's Signet system are virtual currencies because they are a "type of digital unit that is used as a medium of exchange or a form of digitally stored value." *See id.* § 200.2(p) (Further providing that "Virtual Currency shall be broadly construed to include digital units of exchange that (i) have a centralized repository or administrator; (ii) are decentralized and have no centralized repository or administrator; or (iii) may be created or obtained by computing or manufacturing effort.").

[20] Office of Foreign Assets Control, a financial intelligence and enforcement agency of the U.S. Treasury Department.

[21] *Available at* https://www.dfs.ny.gov/system/files/documents/2020/03/il180207.pdf.

date, precise time, payment instructions, fees, names, account numbers, and physical addresses of parties to the transaction. Signature was also required to keep a general ledger and other records. *See* 23 NYCRR § 200.12(a).

154. Second, Signature was required to "consider legal, compliance, financial, and reputational risks associated with [its] activities, services, customers, counterparties, and geographic location and . . . establish, maintain, and enforce an anti-money laundering program based thereon," with "additional assessments on an annual basis, or more frequently as risks change, and . . . modif[ications to] its anti-money laundering program as appropriate to reflect any such changes." 23 NYCRR § 200.15(b).

155. Third, Signature was required to "maintain, as part of its anti-money laundering program, a customer identification program" that includes four components: (i) identification and verification of account holders; (ii) enhanced due diligence for accounts involving foreign entities; (iii) prohibition on accounts with foreign shell entities; and (iv) identification required for large transactions." *See id.* § 200.15(h). More specifically:

a. *Identification and verification of account holders*. When opening an account for, or establishing a service relationship with, a customer, Signature must have, at a minimum, verified the customer's identity, to the extent reasonable and practicable; maintained records of the information used to verify such identity, including name, physical address, and other identifying information; and checked customers against the Specially Designated Nationals list maintained by the Office of Foreign Asset Control (OFAC), a part of the U.S. Treasury Department. Enhanced due diligence may have been required based on additional factors, such as for high-risk customers, high-volume accounts, or accounts on which a suspicious activity report had been filed. *See id.* § 200.15(h)(1).

b. *Enhanced due diligence for accounts involving foreign entities*. If maintaining accounts for non-U.S. Persons, Signature must have established enhanced due diligence policies, procedures, and controls to detect money laundering, including assessing the risk presented by such accounts based on the nature of the foreign business, the type and purpose of the activity, and the anti-money laundering and supervisory regime of the foreign jurisdiction. *See id.* § 200.15(h)(2).

c. *Prohibition on accounts with foreign shell entities*. Signature was prohibited from maintaining relationships of any type in connection with its Virtual Currency Business Activity with entities that did not have a physical presence in any country. *See id.* § 200.15(h)(3).

d. *Identification required for large transactions*. Signature must have required verification of the identity of any accountholder initiating a transaction with a value greater than $3,000. *See id.* § 200.15(h)(4).

156. While the governing regulations governing Signature are detailed, they can be distilled into a number of specific things Defendants were required to do (or questions they were required to ask and receive satisfactory answers to) vis-à-vis Alameda and FTX. During onboarding and as part of Signature's ongoing enhanced due diligence requirements—relevant to possible money laundering and other financial crimes—Defendants were required to:

a. Identify and verify the identities of the beneficial owners and top managers of the Alameda and FTX entities, and update that information regularly.

b. Establish the purpose of each Alameda and FTX account with the Bank, the source of the deposits into each account, and the intended use of those deposits by Alameda and FTX.

c. Ask for and analyze:

i. Alameda and FTX's financial statements (audited and unaudited);

ii. A description of Alameda and FTX's business models (and analyze the risks of those models);

iii. Organization charts for the conglomerate or other information allowing Signature to identify all Alameda and FTX corporate affiliates, and to identify whether Alameda and FTX each had an accounting department, a comptroller's department for cash management, an internal audit function, a compliance function, etc.;

iv. Any complaints or regulatory orders against Alameda or FTX and information regarding any other pending investigations;

      v.     A description or copies of any investor or customer complaints against Alameda and FTX, including lawsuits filed in court or complaints filed directly with the companies or with regulators;

      vi.    A list of each Alameda and FTX entity's board of directors and a list of the date of every board meeting, as well as board minutes;

      vii.   A description of Alameda and FTX's cash management procedures;

      viii.  A copy of Alameda and FTX's written KYC/AML procedures; and

      ix.    Alameda and FTX's written user agreements or terms of service.

    d.    Search the web and available commercial and government databases for negative information on Alameda, FTX, their shareholders, their officers, and their employees. This includes press accounts, social media, litigation filings, government enforcement orders available online, and anything Signature could have discovered through a Google search.

    e.    For the risk analysis of Alameda and FTX, (i) research and analyze the risks of the industries they were in and their lines of business, then ask for a description of their internal controls to manage their risks, a description of their internal and external audit procedures to audit those internal controls, and the findings of those audits; and (ii) do a high-level overview of the strength of the regulatory oversight of their activities in relevant jurisdictions.

    f.    Analyze all transactions through Alameda and FTX accounts at the Bank and identify suspicious transactions, which involves automated transaction analysis, the adoption of triggers setting off automated alerts to bank employees, a comprehensive internal process for employees to analyze red flags and formulate an appropriate response, and an internal audit system to make sure this all works.

157.    Further, Signature's Customer Identification Program (CIP) was required to identify when it should close an account after detecting suspicious activity or after attempts to verify a customer's identity had failed.

158.    Defendants were, of course, well aware of their due diligence obligations. In a July 2018 earnings call—just as Signature's digital asset business was beginning—Defendant DePaolo stated:

I do want to say, one of the things in digital technology, we have turned down billions of deposits, believe it or not, that we could have brought to the institution because of, as they call them, bad actors, that have digital currencies. And you have to watch out from a due-diligence standpoint of bringing on the wrong clients.

159.    In June 2021, Defendant Shay described the Bank's due diligence process for onboarding clients to Signet as a "walled garden":

We built what we call, what I like to call, a "walled garden." If you pass through this walled garden and you're a miner, you're an exchange, you're a custodian, you're essentially any of many, many types of participants,  [over-the-counter desks], whatever; but if you get through our vetting process . . . we have a strenuous KYC / AML process because we are an American onshore bank. But if you get through that, you're going to get into this walled community, this gated community. You get access to Signet and Signet is a blockchain-enabled tool that you can use with other people who are part of this community and they've been vetted too.

160.    Shay further stated:

We take a minority of accounts that apply to us because we do go through a vetting process that is substantial. To get into the gated community does require you to have certain financial wherewithal and to be a solid citizen. We don't just open up an account for anyone who wants to open an account. That's important and that's a differentiator. Frankly, that makes people who are transacting within Signet feel more comfortable because they have gone through a US bank vetting process. That's got its upsides and it's got its downsides. We are who we are, we're a US bank, and we're going to uphold the standards.

161.    In an October 2022 earnings call, DePaolo stated, "In digital, we turn down more clients or potential clients than we bring on clients, because of all the due diligence that we do because we want to deal with the best of the best."

162.    In a July 2021 interview, Signature Senior Vice President and Director of Signature's Digital Asset Group, Joseph Siebert stated, "So as we expand our team and the digital asset banking sector, we're growing pretty rapidly. We're adding components and layers to it now. So we have a risk component broken out of six individuals. We're probably going to expand that even further." Seibert further noted, "it's a heavy lift on a manual side there's a lot we look at, from beneficial ownership, to counterparty risk, to jurisdictions, neighboring jurisdictions, negative news."

163.    In a January 2023 earnings call, Defendant Howell stated, "we're a highly regulated banking institution and we follow strict BSA, KYC, AML policies and procedures. You know, in this space, in particular, we have had to do diligence monitoring."

164.    Defendants engaged in enhanced due diligence processes and procedures when onboarding Alameda, FTX, and related entities, and performed ongoing monitoring over those entities. As part of its onboarding enhanced due diligence, Signature obtained or determined at least the following information relating to each Alameda- or FTX-related entity:

a.      Its name, date of formation, formation location, headquarter address, mailing address, and website.

b.      A breakdown of beneficial ownership (including the identification of anyone owning more than 10%), and an Organizational Chart.

c.      Employer Identification Number (EIN), if in the US.

d.      Primary contact person, including cell number and email address.

e.      Authorized account signers, their corporate titles, and the signing authority given (i.e., individual, any 2, etc.)

f.      Business type and description.

g.      Source of referral to Signature Bank.

h.      Jurisdictions in which entity conducted business or serviced clients.

i.      Whether the entity is required to be regulated or licensed in its jurisdiction and, if so, the details of any such regulation or licensure.

j.      A copy of the entity's written KYC & AML policies.

k.      A description of the background of the entity's owners, including a resume and specific source of wealth for each owner.

l.      A source of funding (*i.e.*, bank account).

m.      The entity's expected average monthly deposit balance.

n.      A copy of the entity's past bank statements.

o.      A specific purpose or description for how the entity will use the account.

p.      The major counterparties the entity is expected to transact with at Signature.

q.      Whether the entity serves institutional clients, retail clients, or both.

165.    Signature periodically required Alameda, FTX, and related entities to update this information, and in any event, at least annually.

166.    As part of their onboarding, Alameda, FTX and their related entities also provided Signature with the following documents.

| Authorized Signers and Owners Over 10% | |
|---|---|
| 1 | Personal Short Form |
| **Business filing documentation** | |
| **For US Entity (or equivalent for International)** | |
| **2.2** | Articles of Formation/Business Certificate |
| **2.3** | Executed Operating Agreement (If Applicable) |
| **2.4** | Proof of Address (company headquarters) |
| **2.5** | W8 BEN E (Foreign entities only) |
| **Additional Documents** | |
| **4.1** | Pitch Deck/Marketing Materials |
| **4.2** | Org Chart |
| **4.3** | KYC/CIP Policy |
| **4.4** | AML/BSA Policy |
| **4.5** | PPM/Offering Agreement (if applicable) |

167.    The "Personal Short Form" noted above required any person with 10% or more beneficial ownership to provide their Full Name, a Copy of Passport or Driver's License, Citizenship, Home Address, Proof of Address (utility bill, cable bill, credit card statement, lease agreement, tax return), Social Security Number (US Citizens only), Date of Birth, Cell Phone, Email Address, and their Employment / Source of Wealth.

168.    Alameda, FTX, and its related entities also had to give Defendants a document providing User Credentials for online banking access, identifying those persons who had access to the entity's accounts, and their authority to view the account, make internal transfers, input wires, approve wires, pay bills, or have all-account access.

169.    As part of their onboarding process, Alameda, FTX, and its related entities also answered— and then annually updated—an "Industry Specific Questionnaire." The instructions stated:

Thank you for taking this time to fill out our Industry Specific Client Questionnaire. **Please select from the Business Type drop down box what services apply to your specific business.** Please then put your answers in the "Answers" column. "Blank" is currently the default setting. If you are in the digital asset exchange business, please select "Exchange." If the exchange also offers OTC services, please also select "OTC." If you are also doing a fund raise through an ICO or something similar, please also select "Digital Asset Fundraising."

**<u>NOTE</u>: If you are an existing client filling this out for an annual update, please select the appropriate Business Type for "<u>Existing Client Update</u>." For example, if you are an existing Mining type client, select "<u>Existing Client Updates - Mining</u>." If you handle multiple industries, please select all applicable.**

170.    Both Alameda and FTX offered OTC services. As a result, both answered the following "Over-The-Counter (OTC) Trading" questions during onboarding, and subsequently updated their answers annually, which were arranged into broader question "types," underlined below:

       r.    <u>Regulatory Questions</u>:

           i.    Does the company offer its services to US users?

           ii.    If so, is the company registered with FinCEN?

           iii.    Does the company offer services to New York based client? [sic]

           iv.    If so, do they have a Bitlicense?

           v.    If you are not servicing US clients, what jurisdictions do you offer services to?

           vi.    Do those jurisdiction require a license?

           vii.    If so, have you registered (please provide a copy of license or registration).

           viii.    Does the company offer any financial products aside from spot trading of digital assets (such as contracts-for-differences, margin trading, derivatives, etc.)?

           ix.    What regulatory frameworks, licenses and exemptions apply?

       s.    <u>AML and KYC Questions</u>

           i.    Please provide a copy of your AML/KYC program.

           ii.    How does the company monitor VPNs?

           iii.    Do you screen and log IP addresses of users?

           iv.    Please explain how the company monitors digital asset transactions? (For example, do they engage a service like ChainAlyis [sic] or Elliptic?)

v.    How many transaction 'hops' do you analyze and explain how this methodology was arrived at.

vi.    Do they do any enhanced monitoring of clients purchasing anonymity coins? If so, please explain.

vii.    If there are any business types that the company will not do business with (prohibited businesses), please list those business types here.

viii.    Does the company have any clients involved in the following industries and if so please provide the names of those users: (1) Adult Entertainment; (b) Casinos; (c) Online Gambling/Gaming; (d) Marijuana Businesses; (e) Weapons Manufacturing/Distribution; (f) Pharmaceuticals; (g) Foreign Governments and Officials; (h) Not-For-Profits/Charitable Organizations.

ix.    How many employees are engaged in implementing the company's AML/KYC program?

x.    How does the company combat synthetic ID fraud? Can they provide an example of this?

t.    <u>Trading Questions</u>

i.    What tokens/coins do you trade? Does client also offers [sic] anonymous or privacy coins/tokens like Monero (XMR), Zcash (ZEC), Komodo (KMD) and/or cannabis related coins like PotCoin (POT) or HempCoin (THC)? Does client also offers [sic] stablecoins like USDT/Tether, TrueUSD, USDCoin, Gemini Dollar, etc.?

ii.    Does client has [sic] a Coin Risk Assessment (CRA) Policies and Procedures? If yes, please provide a copy of client's CRA Policies and Procedures.

iii.    How does the company mitigate or investigate the risk of wash trading, market manipulation an [sic] front running? If possible, please provide your procedures regarding how these investigations are handled.

iv.     Are trading fees publicly listed? If not, would we be able to get a transaction fee schedule? Are there any clients trading outside this trading schedule or with rebates or research or similar arrangements?

v.     If fees are paid to the company in digital assets, where does the company go to liquidate this fee revenue into fiat?

vi.     If the company has an insider trading policy, please provide it. If they do not have one, please explain why.

vii.     How are clients able to fund their accounts? List all fiat methods (wire, credit card, cash). In terms of fiat deposit, do they allow third party deposits? What digital assets can clients fund their wallets with? What steps are taken to determine that the incoming digital assets belong to the account holder?

viii.     Does the company purchase digital assets from other exchanges/issuers to hold as an inventory to trade against users of the platform? If so, from what exchanges/issuers/OTC desks do they purchase from? [sic]

ix.     Do they act in a principal or agent capacity?

u.     <u>Custody Questions</u>

i.     How does the company handle custody (do they do it themselves or outsource it to a third party)?

ii.     If they are doing it themselves, can the company go in more detail about their security protocols for securing assets under custody?

iii.     If the company accepts privacy tokens to custody (like Monero or Zcash), what steps does the company take to get comfortable with those transactions/users?

v.     <u>Basic Company Information</u>

i.     Where is the company's headquarters?

ii.     Does the company have any subsidiaries? If so, what are their names and describe in detail the purpose of each subsidiary. If necessary, please provide an organizational chart.

iii.      Where are the company's servers located?

iv.      What percent of your client base is retail vs. institutional?

v.      Would any retail activity be interacting with the Signature Bank account?

vi.      Please provide a detailed understanding of what the Signature Bank account will be used for and name major credit and debiting counterparties/companies. Does the company anticipate using any transaction methods outside of international/domestic wires or ACH (such as physical cash, Remote Deposit Capture (RDC), third party checks)? If yes, please specify which. Please specify the countries that anticipated counterparties are located in. Please indicate the anticipated USD amount of incoming and outgoing for international wires. Please provide a thorough explanation of the purpose of the outgoing wires. Please indicate the anticipated USD amount of incoming and outgoing for ACH. Please provide a thorough explanation of the purpose of the outgoing ACH.

vii.      Do you use the services of any payment processors? If so, please provide the names of these and explain if we should anticipate seeing funds to and from these payment processors interacting with the Signature Bank account.

viii.      What percentage of your client base is US based vs. international?

ix.      What professionals (law firms, audit firms, accountants, investment bankers, promoters, etc.), in addition to those listed in the PPM, SAFT of Offering materials, have been involved and what role have they served?

x.      What litigation or regulatory actions are pending or threatened?

xi.      What is the cybersecurity history of the prospect – have any wallet thefts, cybersecurity breaches or other theft/fraud allegations occurred?

xii.      What are the privacy policies and compliance with privacy regulations such as GDPR?

xiii.      What is the tax analysis related to the transfers, the raise and the prospect, and are there any tax related actions pending or threatened?

xiv.    What financial institutions have in the past been used or are currently being used?

xv.    What conflicts among founders or information about the background of the principals, the token or currency or other matters that might be in the past, currently or in the future cause there to be negative press that a reasonable investor or financial institution would want to be made aware of when making a decision about doing business with the prospect?

xvi.    What material information or misstatement if any should be disclosed to us that has not been disclosed under prior questions?

w.    <u>Other</u>

i.    Please provide any wallet addresses the company uses for hot and cold wallets. Also indicate if the wallet is being held by the client or at an exchange. Does the client control the private keys to these wallets or does another third party (such as an exchange, custodian, etc.)[?]

ii.    Please describe your wallet infrastructure (how wallets are created, abandoned, etc.)[.]

iii.    What Travel Rule related regulations are you subject to in your jurisdiction of incorporation and geographic service footprint? If you do not believe yourself to be subject to Travel Rule related regulations, please explain why.

iv.    Please provide a brief outline of your systems utilized to remain in compliance with the Travel Rule. How will the company pass on sender and beneficiary information to the receiving institution? How will the company know that they [sic] payment they are making is to another financial institution? If you do not have systems in place to comply with Travel Rule regulations, can you provide us with a timeline of when you will have those systems in place? If you do not plan to implement systems to comply with Travel rule regulations, can you explain why?

171.     FTX was also an exchange. As a result, it answered as part of its onboarding, and subsequently updated annually its answer to all of the above questions, as well as the following additional "Exchange" only questions:

    a.    <u>Regulatory Questions</u>

        i.    Is it a cryptocurrency exchange aggregator?

    b.    <u>Trading Questions</u>

        i.    Are wallets offered custodial or non-custodial?

        ii.    Can users create multiple accounts?

    c.    <u>OTC Questions</u>

        i.    Does the company offer OTC services? If so, do they act in a principal or agent capacity?

    d.    <u>Other Questions</u>

        i.    Is the client a centralized or decentralized exchange?

        ii.    Does the client in the future plans [sic] to launch an Initial Exchange Offering (IEO) on its exchange platform? If yes, does the IEO covers [sic] in our client's AML policies and procedures? What type of token(s) are allowed to be offered (utility, security, stablecoin) in this IEO platform? Does our client requires [sic] this company conducting an IEO to have an AML/KYC Program?

        iii.    Does client has [sic] Cybersecurity and Disaster Recovery/Business Continuity Plan (DR/BCP) policies and procedures to address hacking, ransomware, DDoS or similar related cybercrimes? If yes, please provide a copy of client's DR/BCP policies and procedures. Who is responsible in managing our client's Cybersecurity and DR/BCP? Please provide a short summary of this person's role and qualifications. Have all the firm's personnel been trained in their role in the DR/BCP process? If yes, how does the training process work and how often is the training is [sic] conducted? Are all DR/BCP/plans tested and kept up-to-date on a regular basis? Is the organization regularly backing up their information systems onsite and offsite in light of their DR/BCP plans?

iv.    Does client has [sic] an emergency insurance fund (similar to Binance Secure Asset Fund "SAFU") that will cover/reimburse the lost funds and returned [sic] back those funds to its customers? If yes, please provide a brief description of how this emergency insurance fund works?

172.    Alameda, FTX and related entities also completed, as part of their onboarding, a Funds Transfer Application and a Signet Platform Application. Each required the entity to designate authorized representatives, who were required to provide wet signatures.

173.    As a result of carrying out its enhanced due diligence obligations, including during onboarding and ongoing monitoring, Defendants knew at least the following facts, from which they had actual knowledge of the fraud:

a.    There was no real separation between Alameda and FTX. Defendants knew the fine details of both entities' corporate formations, beneficial owners, management, operations, and organizational structure. They knew both entities were majority owned by Bankman-Fried. They knew the entities shared office space, corporate officers, and personnel. They knew Bankman-Fried was a signatory on and had access to both entities' bank accounts, even after he nominally stepped down as CEO in October 2021.

b.    Alameda played a vital role in the operation of FTX. Defendants knew and understood Alameda's business as a trader and market maker on various cryptocurrency exchanges, including FTX. Accordingly, Defendants knew Bankman-Fried was seriously conflicted because he owned controlling shares of both Alameda and FTX's equity.

c.    Alameda and FTX were involved in risky business models. Defendants knew Alameda and FTX were engaged in risky businesses that needed to be closely monitored. Not only did Defendants know the cryptocurrency market was risky as a whole because of its lack of regulation and ease of use for fraud and crime, but they knew Alameda and FTX were involved in offering and trading risky financial products, such as highly-leveraged margin trades, derivatives, and futures. Defendants also knew the companies operated and headquartered in lightly-regulated, offshore

jurisdictions and that Alameda held large positions in FTT and other illiquid tokens and understood this presented a conflict of interest and risk to the businesses.

        d.    <u>Alameda and FTX lacked adequate corporate formalities</u>. Defendants knew that Alameda, FTX, and related entities lacked boards of directors and never had board meetings. Defendants also knew that Alameda and several of the Alameda- or FTX-related shell entities lacked audited financial statements.

        e.    <u>Alameda and FTX lacked appropriate personnel and procedures</u>. Defendants knew Alameda and FTX's KYC and AML procedures were inadequate and not followed. They knew that neither Alameda nor FTX had adequate personnel in risk management functions. And they knew FTX lacked adequate policies and procedures securing customer assets under custody.

        f.    <u>Bankman-Fried and FTX were directing customers to deposit funds intended for FTX into Alameda-controlled accounts</u>. Defendants knew that the source of funds in Alameda's account was, at least in part, FTX customer deposits, and knew that FTX was directing this, including via wiring instructions on its website. Defendants knew that the intended use of these funds was for deposit onto the FTX trading platform.

        g.    <u>FTX Terms of Service imposed a fiduciary duty on FTX to segregate customer funds</u>. Defendants were aware that FTX and its operational entity, FDM, had a fiduciary duty to FTX's customers, including pursuant to FTX's Terms of Service, to ensure that the customers' funds were segregated and held in trust for the customer. Defendants were also aware that customer funds were not considered the property of FTX or FDM.

        h.    <u>FTX was using "E-Money" to misappropriate customer funds</u>. From a review of FTX's Terms of Service, Defendants knew FTX was using "E-Money," a nonlegal tender, to credit customers' FTX accounts. Because they also knew that those customers were being directed to deposit their funds to Alameda, Defendants knew that neither the funds, nor custody of anything of value representing the funds (such as stablecoins or signets), was actually subsequently transferred to FTX. And because customer funds were not being segregated and held in trust in Alameda's account, where they were instead commingled with the assets of Alameda and other FTX customers,

Defendants knew Alameda and FTX were misappropriating customer funds being deposited into Alameda's Signature bank account.

        i.      <u>Alameda and FTX operated through shell entities</u>. Defendants understood the overall corporate structure of Alameda and FTX, including their numerous affiliates and subsidiaries, several of which Signature banked. Defendants knew these entities, like Alameda BVI, Maclaurin, and FTX Ventures were wholly-owned by either Alameda or FTX, and thus primarily owned by Bankman-Fried. And while Signature did not bank North Dimension, Defendants were aware of the entity, its relationship to Alameda, and its purpose to accept on behalf of Alameda customer funds that those customers had intended for deposit onto FTX.

        j.      <u>The source of Alameda and FTX's venture capital was FTX customer funds</u>. Defendants knew that the source of funds in the accounts of Maclaurin and FTX Ventures was, at least in part, FTX customer deposits.

174.    As part of their ongoing enhanced due diligence, Defendants also knew that a November 2019 federal lawsuit against Alameda and FTX accused them of market manipulation and other financial crimes in an action styled *Bitcoin Manipulation Abatement LLC v. FTX Trading Ltd. et al.*, No. 19-cv-7245 (N.D. Cal.). In light of this, Defendants knew of the alleged criminal activity by Alameda and FTX, including money laundering in the form of transfers of proceeds from illegal activities. According to the lawsuit, the criminal activities, conducted through Alameda and FTX, included:

        a.      Operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a);

        b.      Money laundering in violation of 18 U.S.C. § 1956(a);

        c.      Engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a);

        d.      Wire fraud in violation of 18 U.S.C. § 1343;

        e.      Interstate transportation of stolen property in violation of 18 U.S.C. § 2314;

        f.      Perpetrating a manipulative, fraudulent and deceptive scheme to manipulate the prices of certain cryptocurrency derivatives;

g.    Organizing "FTX Trading LTD [a]s a sham shell entity with nominee officers, directors and shareholders used by Defendants . . . to hide the true ownership and control of defendant FTX from the public and the U.S. authorities";

h.    Processing $30 million of illegal money transfers each day, while "FTX turnover was over $100 million per day," so that "in addition to [the] $30 million per day turnover for Defendant Alameda," the defendants "illegally transmitted over $130 million per day without the required state money transmitter license and the required registration with FinCEN in violation of 18 U.S.C. § 1960(a)"; and

i.    Facilitating and continuing to facilitate the transfer of funds involved in cryptocurrency market manipulation and money laundering.

175.    As part of their ongoing enhanced due diligence, Defendants learned of the substantial public scrutiny and concern in the media about the relationship between Alameda and FTX. In an August 2, 2021 article, for example, one journalist reported "Crypto market participants suggest that Hong-Kong based trading brokerage Alameda Research and its trading partner, crypto exchange FTX, are using insider information to trade digital assets . . . ."[22] And a September 2022 *Bloomberg* article noted that, "As [Alameda's] influence spreads, so have concerns over potential conflicts of interest—particularly its relationship with FTX, the world's second-largest cryptocurrency exchange," and quoted a market participant as saying that "FTX and Alameda 'have been able to benefit from a regulatory gap that has allowed them to trade and profit from cryptocurrencies without having to follow the same rules as traditional financial institutions[.]'"[23]

---

[22] Dana Sanchez, "The Most Influential Trader in Crypto, Sam Trabucco, Works With FTX Exchange: Some See Manipulation," The Moguldom Nation (Aug. 2, 2021), *at* https://moguldom.com/365562/the-most-influential-trader-in-crypto-sam-trabucco-works-with-ftx-exchange-some-see-manipulation.

[23] Anne Massa, Anna Irrera, and Hannah Miller, "Crypto Quant Shop With Ties to FTX Powers Bankman-Fried's Empire: Alameda Research is a little-scrutinized power player in virtual currencies. As its influence grows, so do concerns over a potential market advantage," Bloomberg (Sept. 14, 2022), *at* https://www.bloomberg.com/news/articles/2022-09-14/trading-firm-alameda-research-powers-ftx-ceo-sam-bankman-fried-s-crypto-empire.

176.    Defendants also learned of disturbing statements made by Bankman-Fried. In an August 6, 2021 interview with Bloomberg's Matt Levine, for example, Bankman-Fried explained how a token like FTT can be used to perpetrate a fraud:

> You start with a company that builds a box and in practice this box, they probably dress it up to look like a life-changing, you know, world-altering protocol that's gonna replace all the big banks in 38 days or whatever. Maybe for now actually ignore what it does or pretend it does literally nothing. It's just a box. So what this protocol is, it's called "Protocol X," it's a box, and you take a token.
>
> . . . So you've got this box and it's kind of dumb, but like what's the end game, right? This box is worth zero obviously. . . . But on the other hand, if everyone kind of now thinks that this box token is worth about a billion dollar market cap, that's what people are pricing it at and sort of has that market cap. Everyone's gonna mark to market. In fact, you can even finance this, right? You put X token in a borrow lending protocol and borrow dollars with it. If you think it's worth like less than two thirds of that, you could even just like put some in there, take the dollars out. Never, you know, give the dollars back. You just get liquidated eventually. And it is sort of like real monetizable stuff in some senses.[24]

177.    Similarly, during an April 2022 Bloomberg podcast, Bankman-Fried described FTX's yield farming in a manner that others equated to a Ponzi scheme, which Bankman-Friend agreed was "a pretty reasonable response."[25] News and social media picked up on the Ponzi scheme analogy, including in articles published by BeInCrypto and CoinGeek, in a column published on UnHerd, and on YouTube.

**B.    By Virtue of Receiving Express Instructions from Clients Like Plaintiffs**

178.    At various times, Signature's digital asset clients provided Defendants with information from which they learned of the fraud. Plaintiffs' experience is instructive.

179.    Plaintiff Statistica Capital is a trading firm that both invests its own money and manages the money of Plaintiff Statistica Fund. During the relevant time period, Statistica Capital maintained a bank account at Signature Bank and was a participant on Signet. Throughout 2022, Statistica Capital used Signet

---

[24] "Transcript: Sam Bankman-Fried and Matt Levine on Crypto Market Structure," Bloomberg (Aug. 6, 2021), *at* https://www.bloomberg.com/news/articles/2021-08-06/transcript-sam-bankman-fried-and-matt-levine-on-crypto-market-structure.

[25] Tracy Alloway and Joe Weisenthal, "Sam Bankman-Friend Described Yield Farming and Left Matt Levine Stunned," Bloomberg (April 25, 2022), *at* https://www.bloomberg.com/news/articles/2022-04-25/sam-bankman-fried-described-yield-farming-and-left-matt-levine-stunned.

to deposit funds into what it believed was its FTX account, transacting a total of over $1.8 million during that time.

180.    On October 13, 2022, Statistica Capital used Signet to deposit $300,000 into what it believed was its FTX account, which credit was reflected in its FTX account shortly thereafter. Rather than actually transfer custody of those funds to FTX, though, the credit was notational only, and Statistica Capital's deposit in fact remained in the possession, custody, and control of Alameda. Statistica Capital subsequently transferred this money (really a valueless "E-money" credit) to the FTX account of its majority owner as a dividend.

181.    During the relevant time period, Statistica Fund held the money of several accredited investors and was managed by Statistica Capital. During the relevant time period, Statistica Fund maintained a bank account at Signature. In 2021, Statistica Fund applied to participate in Signet and provided to Defendants a Due Diligence Overview form in which, in a section titled "Account Activity," Statistica Fund stated that the "Major counterparties [it] expected to transact with at Signature" were "**FTX OTC**, Tether, mostly[.]"

182.    In onboarding with Signature, Statistica Capital in 2020, and Statistica Fund in 2021, communicated with Signature representatives including Sarmen Saryan. Signature asked Statistica Capital multiple rounds of clarifying questions about its business before permitting it onto Signet.

183.    When managing Statistica Fund moneys, Statistica Capital relied on a third-party fund administrator, NAV Consulting, to initiate wires, which Statistica Fund disclosed to Signature.

184.    Beginning in August 2021 and continuing into 2022, Statistica Fund—at the direction of Statistica Capital, and facilitated by NAV Consulting—initiated with Signature at least six wire transfers totaling $24,675,000, from its Signature Bank account to an account for North Dimension Inc. at Silvergate Bank in La Jolla, California, which was in fact controlled by Alameda, as alleged herein. The wires varied in amount between $500,000 and $9,000,000. FTX's website had instructed FTX customers to wire funds intended for trading on the FTX platform to this North Dimension account. When Statistica Fund initiated the wire transfers, it did not know that in fact Alameda controlled the North Dimension account.

185.    Meanwhile, Defendants knew Statistica Fund intended for these large wires to be deposited with FTX for trading on the FTX platform. Defendants also knew that North Dimension was an Alameda-

controlled entity and that it had no legitimate business purpose, instead existing only to surreptitiously collect FTX customer funds for Alameda. Defendants facilitated these wire transfers anyway.

186.    More specifically, when Statistica Fund asked NAV Consulting to initiate the first wire on August 31, 2021, it advised NAV Consulting that the wire was being made to "transfer these [funds] to Statistica Fund's FTX account," and stated, "here are the FTX wiring details," providing the North Dimension wiring information that FTX had posted on its website.

187.    In March 2022, a Senior Client Associate Officer in Signature's Digital Asset Banking group, Nicole Santiago, sent an email to Statistica Fund advising it that its "account is currently under review by our Analyst Team," which was "asking for clarity on the below items." The email identified a $9 million "Wire Out" to "North Dimension," and a $3 million "Wire Out" to "FTX Digital Markets Ltd." The email asked Statistica Fund to "provide the purpose of the wires listed above." In response, Statistica Fund advised Signature:

> When we receive new subscriptions from Statistica Fund Ltd investors, we send them to the fund's FTX account, to then be able to use these funds for trading. Both these transactions are transfers to the fund's FTX account. The beneficiary details changed because FTX relocated their HQ between those two transactions.[26]

Santigo stated that she would "notify compliance" and "should they have any additional questions I will circle back here." Santigo never subsequently followed up. Defendants did nothing to reverse the $9 million wire to North Dimension or to otherwise recover Statistica Fund's funds that Defendants knew were misappropriated. Defendants also never advise Statistica Fund of the misappropriation.

188.    A short while later, Statistica Fund advised Santiago that it "would like to start using Signet for the transfers between our Statistica Fund Ltd. Bank account and Statistica Fund's FTX account," and asked for her help "to set this up[.]" Santiago provided Statistica Fund some forms and instructed it to fill out and submit them, which it did. Defendants processed these forms even though Statistica Fund told Defendants

---

[26] This last sentence was Statistica Fund's best understanding, or assumption at the time, but was incorrect. In fact, the wiring information changed because FTX and Alameda were trying to hide their theft from FTX customers.

it was seeking to use Signet to fund its FTX account, which Defendants knew was impossible since FTX did not have an active account on Signet.

**C.      By Virtue of Operating Signet**

189.    Signet was built on a centralized blockchain controlled by Signature, itself built on the decentralized Ethereum blockchain, one of the most established and used blockchains in existence. Accordingly, any dollar transfers between entities participating in and using Signet are captured in perpetuity in both Signature's private records, and to some extent on the Ethereum public ledger. Signet was also built specifically to comply with U.S. and N.Y. banking regulations. Thus, as Defendant Shay stated about Signet in a June 2021 interview, "It's just like the blockchain," and "we're standing behind ***and watching*** the digital representation of the dollar."

190.    As shown in the below excerpt from Signature's "Guide to Using the Signet Platform," "Comprehensive details of every Signet^(TM) transaction (Deposit, Send, Receive, Redeem) are always available within [a Bank client's] Transaction History and may be exported in .CSV format," and "provided via email immediately . . . ." Of course, Signature itself also necessarily maintained all such transaction details.



191.    Indeed, as a Virtual Currency Business under New York law, Signature was required to maintain records of virtual currency transactions, including of signets (*i.e.*, Signature's proprietary Ethereum-based token). Specifically, Defendants were required to:

> maintain the following information for all Virtual Currency transactions involving the payment, receipt, exchange, conversion, purchase, sale, transfer, or transmission of Virtual Currency:
>
> i)    the identity and physical addresses of the party or parties to the transaction that are customers or accountholders of the Licensee and, to the extent practicable, any other parties to the transaction;
>
> ii)   the amount or value of the transaction, including in what denomination purchased, sold, or transferred;
>
> iii)  the method of payment;
>
> iv)   the date or dates on which the transaction was initiated and completed; and
>
> v)    a description of the transaction.

*See* 23 NYCRR § 200.15(e)(1).

192.    Defendants were also required to maintain reports on certain virtual currency transactions exceeding an aggregate daily value of $10,000 if not otherwise required under federal law. *See id.* § 200.15(e)(2).

193.    More generally, Defendants were required to "monitor for transactions that might signify money laundering, tax evasion, or other illegal or criminal activity," and to "review[] on an ongoing basis" "[c]ontinuing suspicious activity . . . ." *See id.* § 200.15(e)(3).[27]

194.    By virtue of controlling and operating Signet, and in carrying out Signature's regulatory obligations to track virtual currency transactions, Defendants had a unique and particularly clear view into what was going on in the accounts of Signet participants, including Alameda and Plaintiffs.

195.    As Defendant Shay stated in his June 2021 interview:

---

[27] The applicable regulations also prohibit Signature from "structur[ing] transactions, or assist[ing] in the structuring of transactions, to evade reporting requirements," and from "engag[ing] in, facilitat[ing], or knowingly allow[ing] the transfer or transmission of Virtual Currency when such action will obfuscate or conceal the identity of an individual customer or counterparty." *See id.* §§ 200.15(f)-(g).

**Q:** Do you ever lose sleep that there might be a Mt. Gox there somewhere like in that pool of customers, in that pool of clients, that if something goes wrong, the regulators will come after you and say, "Okay, we got to do an audit of this whole thing." Do you lose sleep over that at all?

**Shay:** Well, here's the thing. We're not touching the crypto itself and we're not custodian for the crypto. We're facilitating the payments. And if the regulators ever wanted to see where all the payments were coming, we're a US-regulated bank, so they could always see as they could anywhere, what's happening.

196. Defendants' observing and processing the transfer of funds on Signet gave them insight into both what was and what was *not* happening with Signet members' accounts. As a result, Defendants knew at least the following facts, from which they had actual knowledge of the FTX fraud:

    a. Money going into Alameda's Signet account consisted of funds deposited by FTX customers for trading on FTX.

    b. Alameda did not transfer those customer funds to FTX (or anyone) for custodial safekeeping or otherwise.

    c. Alameda did not provide FTX with like-value reimbursement for these deposits, such as stablecoins.

    d. Alameda did not segregate the customer funds into FBO accounts or otherwise.

    e. Alameda drew those funds itself, by transferring them into other accounts it held at Silvergate Bank and elsewhere.

197. In sum, by virtue of operating Signet, Defendants directly observed the improper commingling and misappropriation of customer funds because they processed transfers of those funds from Alameda's Signet account to accounts other than FTX exchange accounts.

**D.      By Virtue of Performing Enhanced Blockchain Analysis**

198. Since at least July 2021, Signature has employed software tools called Chainalysis and Cyber Trace, which analyze and report on blockchain transactions.

199. While blockchains are public and offer a permanent digital record, the data available is limited, and typically comprised of strings that are difficult to understand standing alone (such as transaction

hashes and wallet addresses). Tools like Chainalysis and Cyber Trace apply algorithms and extensive databases to make this blockchain information useable.

200.    As shown in the slide below from a Chainalysis presentation, the tool helped Defendants visualize and understand what was occurring on various blockchains.



201.    Chainalysis' "Know Your Transaction" product includes a dashboard providing a host of data about any given transaction or customer. First, the "home page" of the dashboard provides analytics ranking the risk of users.



202.    Next, the product includes a "Users" dashboard that provides more granular data.







203.     Chainalysis includes a second tool, called Reactor, that allows a user to further visualize the blockchain data to understand the history of transactions. Sample screenshots appear below.





204.    These tools were capable of monitoring major blockchains, like Bitcoin and Ethereum, several major stablecoins, and numerous other digital assets, which increased over time. With the tools, Defendants could learn the history of any blockchain transaction, including the source and fate of funds, the history of wallets involved, including their ties to illicit activity and, in some cases, the identity of their owners.

205.    During the relevant time period, Defendants also used the services of an Australian company called Cyber Trace. The company describes itself as "dedicated to developing innovative solutions for countering cyber enabled investment fraud through Artificial Technology, Big Data, and Analytical Algorithms," with a "specific area of expertise" in "the development of cryptocurrency Anti Money Laundering (AML) technologies."[28]

206.    In a July 2021 interview, Signature Digital Asset Business Group Manager, Joseph Siebert, when asked about the cryptocurrency landscape, said:

> So we're excited. We continue to push forward, look at our regulators, the landscape we have in front of us, and follow the plan that we've set forth, which is extensive due diligence, guard rails around certain jurisdictions and funds flow, and making sure we understand Bitcoin's

---

[28] *See* "Who are we?" *at* https://technologies.cybertrace.com.au.

movement on the blockchain. You know, are these coins that are being traded touching dark markets, are they clean coins, you know. So using tools like Chainalysis and Cyber Trace has been helpful for the bank as well.

207.    Seibert further stated that, "as a publicly traded bank audited by . . . New York Department of Financial Services and the FDIC—we get two different bodies looking at us—and so what we try to do is collaborate with both and share information and be open and transparent. So, with that comes a lot of, you know, transactional flow that we analyze."

208.    Because Defendants used Chainalysis and Cyber Trace, they had a full view of the origin and destination of customer funds deposited into Alameda's accounts. Defendants thus knew that customer funds were never actually being transferred to FTX, but rather being drawn by Alameda directly.

**E.    By Virtue of Cryptocurrency Expertise and Close Connection to the Industry**

209.    Signature was well-known as one of the most crypto-friendly banks in the world because it had been one of the few in the U.S. willing to bank digital asset industry members during the last several years. It began this effort by hiring in 2018 a private banking team already experienced in the digital asset industry. Having been involved in the industry for approximately five years when it shuttered, and having had personnel with even more industry experience, Signature had developed a close connection to and expertise about the industry.

210.    In a July 2018 quarterly earnings call, when asked about Signature's hiring a team with "backgrounds in blockchain," Defendant DePaolo said:

> This opportunity is significant if you're dealing with the right clients. And we hired a team, which is in the digital space, and they've been there for a number of years and have a knowledge base in that industry to know who and who not to deal with.

211.    As a result, separate and apart from its due diligence actions, Defendants were well aware of the close ties between Alameda and FTX, for example, their shared office space and personnel. Defendants also understood the companies' respective businesses and their roles in the cryptocurrency trading market. Defendants were likewise aware of Bankman-Fried's dominant role in both businesses' activities. And Defendants were aware Alameda and FTX went on a venture capital spending spree during the crypto winter, buying up failing or struggling crypto businesses in what were obviously bad deals for Alameda and FTX.

As Defendants knew, these types of venture investment transactions typify the "integration" phase of money laundering, creating the appearance of legality.[29]

212.    In addition, Defendants were aware of FTX's Terms of Service from onboarding and ongoing due diligence and were aware the Terms prohibited U.S. customers from using the FTX international platform. Moreover, based on ongoing online review, Defendants were aware that, contrary to this prohibition, FTX did not actually exclude U.S. customers from using the FTX International Platform. Defendants likewise knew, by at least October 2022, that FTX facilitated use of the platform by U.S. customers by offering a mobile app, purchased from Blockfolio LLC and rebranded by FTX, that did not block U.S. users' access, as described by the Director of Enforcement of the Texas State Securities Board filed in a declaration filed in *In re: Voyager Digital Holdings, Inc.*, No. 22-10943-MEW (S.D.N.Y. Bankr.), Dkt. No. 536.

### F.    By Virtue of Numerous Red Flags

213.    The Federal Financial Institutions Examination Council required Signature to monitor high-risk customers such as FTX and Alameda for red flags of suspicious activity.[30]

214.    Throughout the relevant period, there was a wide variety of information available to Defendants that served to act as red flags of the fraudulent activity. Between 2018 and 2022, other entities observed some or all of these red flags and refused to do business with FTX as a result.[31]

---

[29] Federal Financial Institutions Examination Council  (FFIEC), Bank Secrecy Act/Anti-Money Laundering Examination Manual (2014) at 8.

[30] *Id.*, at Appendix F.

[31] For example, in 2018, crypto venture firm Dragonfly Capital was considering investing in FTX. After doing due diligence, it concluded that Bankman-Fried's "risk-taking was catastrophic," and "saw red flags – too much risk" to invest. Moreover, some potential investors who conducted due diligence in 2018 and 2019 concluded Bankman-Fried "hid serious things and took incredible risks with other peoples' money," and that Alameda was "hemorrhaging money to pay for FTX." In May 2022, FTX offered $485,000 to MITRE to research bioweapon security. MITRE, however, declined to finalize the gift citing concerns over unnamed red flags. Finally, in July 2022, an FTX subsidiary called FTX Future Fund offered the nonprofit, Our World in Data, a $7.5 million grant to track changes in living standards, the global impact of Covid-19 and other relevant trends. After conducting due diligence, the nonprofit declined.

### 1.    The Cryptocurrency Industry

215.    The cryptocurrency industry is relatively nascent, with the first cryptocurrency, Bitcoin, having been invented in 2008. As a result of its lack of regulation and ease of use, including across borders, the industry has proven to be a haven for financial crimes, like money laundering.

216.    As recently as February 2022, for example, Fitch Ratings reported on the launching of a consortium of U.S. banks and fintechs wanting to use stablecoin for payment transfers and other digital assets. According to Fitch, "Lack of legislation or clear regulatory guidance has made U.S. banks cautious to enter the digital asset space," with policymakers "increasingly voic[ing] concerns around money laundering/terrorism financing and know-your-customer (KYC) issues, as well as price volatility of cryptocurrencies."[32]

217.    Defendants were well aware of the industry's propensity to attract bad actors. In its 2021 10K, certified by Defendant DePaolo, Signature wrote of the risks associated with its "expansion into the marketplace for digital asset transactions and deposits":

> [T]he digital asset industry is somewhat nascent and the use of digital assets in financial transactions is an emerging practice. Certain characteristics of digital asset transactions, such as the speed with which such transactions can be conducted, the ability to transact without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, and the anonymous nature of the transactions can make digital assets vulnerable to fraud, money laundering, tax evasion and cybersecurity risks. At present, digital assets and digital asset service providers are not subject to extensive regulation.

218.    Moreover, as a relatively early participant in the cryptocurrency industry—and a provider of essential technology and banking services to the industry—Defendants have been aware of the numerous high-profile frauds that have plagued the industry over the years.[33]

219.    In a June 2021 interview, Defendant Shay stated, "If we just looked at what other banks were doing, we wouldn't be accepting crypto customers, crypto clients." Moreover, Shay recognized the "opportunities and threats" of cryptocurrency:

---

[32] Fitch Wire, "US Bank Stablecoin Consortiums Signal Growth of digital Asset Demand" (Feb. 9, 2022), *at* https://www.fitchratings.com/research/banks/us-bank-stablecoin-consortiums-signal-growth-of-digital-asset-demand-09-02-2022.

[33] Some examples include Mt. Gox, Onecoin, Bitconnect, Thodex, Bitclub Network, Quadriga, and Plexcoin.

I think listeners need to understand the spectrum when I say opportunities and threats. I don't think people mostly get the space, that they're all on the same wavelength. So, at the one hand, you can have a cryptocurrency where nobody knows who the recipients are, what the wallets are, anything. And there's anonymity. Bitcoin gives you some of that, gives you a good chunk of that. And the good news is, I can do business with you and it's nobody else's business what we're doing. And that's fine. The problem is, of course, you could be making a transfer because you're involved in human trafficking, drug selling, arms. Pick the bad thing and you could be doing that and there's nobody to be able to tell that that transfer has taken place because of anonymity.

### 2.    FTX's Avoidance of U.S. Regulation

220.    In late 2018 and in 2019, Bankman-Fried moved FTX to Hong Kong for friendlier cryptocurrency regulations, and then to The Bahamas in 2021, so that it could offer risky trading options that were not legal in the United States.

221.    That Alameda and FTX relocated in this manner was a red flag. Not only did FTX do so to avoid U.S. regulation and oversight—the same reason it purported to exclude U.S. customers—but in 2000, the Organization for Economic Co-operation and Development placed The Bahamas on a blacklist for tax havens, and in 2020, the European Union placed the Bahamas on a blacklist of high-risk countries for money laundering and terrorist financing.

### 3.    The Involvement of Daniel Friedberg in FTX and Alameda

222.    According to FTX's present CEO, John J. Ray III, FTX, Alameda, and its associated entities were run by a "group of inexperienced, unsophisticated, and potentially compromised individuals[.]"[34]

223.    One person exercising a substantial amount of control and discretion on behalf of Alameda and FTX was Daniel Friedberg, a Seattle-based lawyer who acted as FTX's Chief Regulatory Officer and General Counsel, and as Alameda's Legal Counsel.

224.    As FTX's Chief Regulatory Officer, Friedberg was responsible for monitoring customer protection practices, ensuring product offerings complied with existing rules, and overseeing internal audits and reviews, among other things. Friedberg, however, is notorious for his role in an online poker cheating scandal involving the theft of millions of dollars.

---

[34] *In re FTX Trading Ltd. Bankr.*, No. 22-11-68-JTD (D. Del.), Dkt. No. 24, Declaration of John J. Ray III ("Ray Decl.") ¶ 5.

225.    In 1999, Friedberg became involved in online gambling, acting as a corporate agent for companies set up by professional poker players, including Phil Hellmuth and Annie Duke. In 2006, Hellmuth, Duke, and Russ Hamilton, the 1994 World Series of Poker champion, were employed by Excapsa Software, an online gaming software company in Toronto where Friedberg was an executive. Excapsa and its three units in Malta managed a poker network and licensed online gaming software applications.

226.    Among its sites was Ultimate Bet. In 2008, some high-stakes players on Ultimate Bet accused others of being able to see their cards and profiting on bets using that knowledge. It later emerged that tweaks to Ultimate Bet's software—known internally as God Mode—had allowed some players to see others' hands. An estimated $40 million was stolen using this cheat. Investigations traced the cheat to Excapsa. The Kahnawake Gaming Commission of Canada, which oversaw Ultimate Bet, conducted an audit and "found clear and convincing evidence to support the conclusion that between the approximate dates of May 2004 to January 2008, Russell Hamilton, an individual associated with Ultimate bet's affiliate program, was the main person responsible for and benefitting from the multiple cheating incidents."[35]

227.    In 2013, Travis Makar, a computer expert and executive assistant to Hamilton, released audio recordings from 2008 in which Hamilton and some Ultimate Bet associates met to discuss how to deal with the cheating scandal. In it, Friedberg suggests the group claim a consultant "took advantage of a server flaw by hacking into the client, unable to identify exactly when," and said that "If we can get [the refund amount] down to $5 [million], I'd be happy."[36] That recording was made public and widely circulated online.[37]

---

[35] Kahnawake Gaming Commission, "Kahnawake Gaming Commission Imposes Sanctions on Ultimate Bet with Regard to Cheating Incidents" (Sept. 29, 2008), *at* http://www.gamingcommission.ca/news/pr09282008a.pdf.

[36] Recording available at https://youtu.be/XrnmyWu1vS0; *see also* Brett Collison, "Audio Tapes Expose Ultimate Bet Cheating Scandal; Phil Hellmuth Responds," PokerNews.com (May 13, 2013), *at* https://www.pokernews.com/news/2013/05/audio-tapes-expose-ultimate-bet-cheating-scandal-14986.htm.

[37] Recording available at https://youtu.be/XrnmyWu1vS0; *see also* Brett Collison, "Audio Tapes Expose Ultimate Bet Cheating Scandal; Phil Hellmuth Responds," PokerNews.com (May 13, 2013), *at* https://www.pokernews.com/news/2013/05/audio-tapes-expose-ultimate-bet-cheating-scandal-14986.htm.

228.    Given Friedberg's well-known and indisputable connection to a multi-million-dollar fraud, his involvement in providing legal advice—particularly to *both* Alameda and FTX—was a red flag of the fraud.

## VI.    DEFENDANTS FACILITATED THE FRAUD

229.    Defendants substantially facilitated the FTX fraud by, at a minimum (i) publicly promoting FTX; (ii) failing to close, suspend, or otherwise limit any Alameda and FTX accounts, despite knowing that the accounts were being used in violation of FTX's Terms of Service and its fiduciary duties to its customers; and (iii) accepting additional customer deposits into Alameda accounts after learning of the fraud.

230.    Signature's private team business model is highly client-centric. In a June 2021 interview, Defendant Shay explained:

> [W]e always were focused on *what does the client want?* The clients want two things: they want sleep-at-night safety. . . . Second is just figuring out how can we help the client make more money? . . . [W]e're less interested in what other banks are doing than what our clients are thinking. I mean, honestly, when I get up in the morning and when my head hits the pillow at night, I'm not really thinking as much about what our competitors are doing as much as how can we make our clients make more money? And if we can do that, how can we make them happier? How can we make them make more money? Or help them make more money?

231.    Shay further explained that "we don't use the term customers at the bank. Because we want to treat everybody like a client, someone as a counterparty that we can help make better, and work with, and partner with." And Shay said, "We think about how we can help our clients all the time[.]"

232.    Defendant DePaolo, echoed these comments during an April 2022 earnings call, saying about Signet, "what we do, we basically listen to the client. In this industry, we listen to the client very closely, and they kind of dictate what we should do next."

233.    The team servicing Signature's cryptocurrency clients is its Digital Asset Banking Group, as shown in the below excerpt from a 2020 Signature marketing brochure.

**SIGNATURE BANK'S DIGITAL ASSET BANKING GROUP**

**Joseph Seibert**
*Senior Vice President, Group Director, Digital Asset Banking*
646.949.4022 | JSeibert@SignatureNY.com
1400 Broadway, 26th Floor, New York, NY 10018

**David D'Amico**, *Group Director - Vice President*
646.949.4024 | DDamico@SignatureNY.com

**Sarmen Saryan**, *Group Director - Vice President*
646.949.4023 | SSaryan@SignatureNY.com

**Melissa Rivera**, *Senior Client Associate*
646.949.4099 | MRivera@SignatureNY.com

**Theo Been**, *Senior Client Associate*
646.949.4026 | TBeen@SignatureNY.com

**Nicole Santiago**, *Senior Client Associate*
646.949.4095 | NSantiago@SignatureNY.com

**Bridget Palacios**, *Client Associate*
646.949.4025 | BPalacios@SignatureNY.com

**Fahima Begum**, *Client Associate*
646.949.4054 | FBegum@SignatureNY.com

**Signet™ is a brand of Signature Bank\*, a New York State-chartered bank and Member FDIC.**
565 Fifth Avenue, New York, NY 10017 | SignatureNY.com
With over $50 billion in assets, Signature Bank is a full-service commercial bank built upon strong financials and exceptional client service, provided by experienced financial professionals. Signet is just one of many robust products and services offered by Signature Bank.

234.    In a June 2021 interview, when asked how Signature reconciled the anonymity of cryptocurrency with regulatory KYC requirements, Defendant Shay stated:

> The first thing is having the right folks interact with the clients, because to a great degree, your marketing is your underwriting, you want to be dealing with the right people. If you have the right people, if your colleagues are the right people and they have the right values, then they will do the pre-screening of who are the folks we can rely on. We wouldn't have gotten going if we couldn't have brought on Joe Seibert, who leads that area for us in terms of client contact, Sarmen Saryan, and David D'Amico. They really form the bedrock of folks that we could work with, and we brought them onboard. We ended up turning down many more clients than we bring up.

235.    Shay further stated:

> As of the end of last year, we had $10 billion in deposits related to that. In the first quarter, we announced that had grown another $4.4 billion. But the thing is, those deposits have velocity among themselves because they're being used to settle. That gives people a lot of comfort. And that's what's allowed us to really grow because they get the safety and security of a bank, they get Joe Seibert, Sarmen Saryan, and David D'Amico, and the rest of team to call.

236.    In a July 2021 interview, Seibert stated about Signet, "what's great is there's more institutions joining the network every day. Even though we're cautious with who we onboard, we still want to help the ecosystem. You know, the exchanges need certain, you know, counterparties on there for liquidity and settlement 24/7."

237.    FTX was a long-time user of Signature banking services and an important client to Signature.

As DePaolo explained during a September 2022 earnings call:

> The exchanges are our biggest deposits. And that doesn't include the clients that are coming on board that want to deal with those exchanges. So what happens is, we get a benefit of the exchange joining us and then all the clients following them to Signet. And so, we certainly don't want to charge a fee for the exchanges because they're actually bringing us business by moving on to the platform.

238.    Evincing FTX's early use of Signet, in a June 28, 2020 tweet thread, Sam Bankman-Fried wrote, that "SigNET was terrible until relatively recently," and "I suspect ta [*sic*] lot of this is a holdover from when it took 1 day to move money from signet to Signature (!!!)"



239.    A few months later, in November 2020, Bankman-Fried tweeted that "fiat rails are a *total* mess[,] but also really important," and that "FTX is building slowly but carefully: we have ~10 of them," but "we only roll out ones if we trust them," and "It's taking a lot of time." In response to a question about the 10 fiat rails, Bankman-Fried identified Signature's "SigNET," among others.

73



240.    Subsequently, in October 2021, FTX made an "official" announcement about the integration of Signet into FTX, as shown in the tweet below.



241.    This, however, was false, and Defendants knew it. As Defendant Howell explained during a January 2023 earnings call—after FTX had collapsed and entered bankruptcy—"we had announced that we're integrating FTX, but we were not integrated yet with FTX. So, we didn't have client-related transactions of FTX happening on our platform."

242.    Despite Bankman-Fried's public lies about FTX's Signet presence and participation, Defendants relied on his endorsement to market Signet. In an April 12, 2022 press release, Defendants quoted Bankman-Fried as follows:

> FTX.US, a U.S-regulated cryptocurrency exchange, is among those benefitting from Signet. FTX CEO and Founder Sam Bankman-Fried commented on the Bank's new Fedwire transfer feature: "Partnering with Signature Bank, an established financial institution and fintech pioneer, will allow us to continue to grow our business by leveraging all the advantages and key aspects of Signet. The implementation of an API-enabled, blockchain-based digital payments platform to initiate blockchain transactions and Fedwire transactions via Signet is just the latest move toward revolutionizing the payments industry through the power of blockchain technology."[38]

243.    And Defendants praised Bankman-Fried on social media.



*Pictured L to R: Sarmen Saryan, Bankman-Fried, and Joseph Siebert*

---

[38] Press Release, "Signature Bank Adds Fedwire Feature to Its Signet Digital Payments Platform, Allowing Instant Transfers Through Its Application Programming Interface" (April 12, 2022), *available at* https://investor.signatureny.com/pme/press-releases/news-details/2022/Signature-Bank-Adds-Fedwire-Feature-to-Its-Signet-Digital-Payments-Platform-Allowing-Instant-Transfers-Through-Its-Application-Programming-Interface/default.aspx.

244.    By featuring Bankman-Fried and FTX in this highly-public manner, Defendants bolstered their legitimacy.

245.    During the relevant time period, Signature held multiple accounts for FTX- and Alameda-related entities.

246.    First, Signature held at least two accounts for Alameda, which was organized in Delaware and originally headquartered in Berkeley, California. The account ending in -5489 was specifically a Signet account.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |
| Hive Empire Trading Pty Ltd | Signature Bank | 3087 |
| Ledger Holdings Inc. | Signature Bank | 8106 |
| Ledger Prime LLC | Signature Bank | 5385 |
| Ledger Prime LLC | Signature Bank | 5377 |
| Paper Bird Inc | Signature Bank | 8701 |
| West Realm Shires Inc. | Signature Bank | 7436 |
| West Realm Shires Services Inc. | Signature Bank | 2804 |
| West Realm Shires Services Inc. | Signature Bank | 3976 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| FTX Lend Inc. | Signature Bank | 7651 |
| Crypto Bahamas LLC | Signature Bank | 5171 |
| Good Luck Games, LLC | Signature Bank | 7432 |
| Goodman Investments Ltd. | Signature Bank | 2903 |
| West Realm Shires Financial Services Inc. | Signature Bank | 9812 |
| Alameda Research LLC | Signet | 5489 |
| Ledger Holdings Inc. | Silicon Valley Bank | 7808 |

247.    During the Relevant Time Period of May 2019 to November 2022, FTX directed certain high-worth commercial clients, including Plaintiff Statistica Capital, to deposit funds for trading on FTX.com through Signature Bank's Signet platform. There was, however, no Signet account for any FTX entity.

248.    In fact, FTX customers were actually being directed to deposit their funds into a Signet account opened and controlled by Alameda. FTX customers, including Statistica Capital, did not know that Alameda owned and controlled that Signet account. Meanwhile, Defendants knew that customer funds, including Statistica Capital's, were intended for FTX, and knew those funds were being deposited by some of its Signet customers, including Statistica Capital, into an Alameda-controlled Signet account.

249.    Second, Signature held two accounts for FTX Trading Ltd., a company organized in Antigua and headquartered in The Bahamas, that was the parent company of FTX Digital Markets Ltd., which did business as FTX.com, *i.e.*, the FTX International platform.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |

250.    Third, Signature held an account for FTX Ventures Ltd., as shown below.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |
| Hive Empire Trading Pty Ltd | Signature Bank | 3087 |

Among 36 banks identified in the FTX bankruptcy as holding Alameda- and FTX-related accounts, only two held accounts for this entity: Signature and its primary competitor, Silvergate Bank.

251.    Fourth, Signature held an account for Maclaurin Investments Ltd., which is organized and headquartered in the Seychelles.

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |

Among 36 banks identified in the FTX bankruptcy as holding Alameda- and FTX-related accounts, Signature is the only bank that held an account for Maclaurin.

252.    Through transfers to these Signature Bank accounts, Alameda was able to use customer funds to pay off third-party lenders in 2022; to extend "loans" to Bankman-Fried, Wang, and other FTX insiders; and to fund its venture spending spree. Defendants observed and processed the transfer of funds through these accounts.

253.    Moreover, through these Signature Bank accounts, FTX transferred customer funds to Alameda for various illicit purposes including undisclosed venture investments, real estate purchases, political donations, and personal "loans" to insiders.

254.    Defendants continued to bank Alameda, FTX, and related shell corporations and entities even after learning of their misappropriation of FTX customer funds, breach of fiduciary duties, and other wrongdoing.

255.    Despite knowing of the fraud carried out through Alameda, FTX, and related entities, at no point prior to FTX's bankruptcy did Defendants cease doing business with Alameda, FTX, or Bankman-Fried, nor did they suspend, close, or otherwise limit Alameda, FTX, and related entities' bank accounts.

256.    Rather, seeing skyrocketing deposits, revenues, profits, and for the Individual Defendants, personal income from Alameda and FTX's dominating performance in the crypto marketplace, Defendants continued to take more deposits from FTX's institutional customers and to transfer them into Alameda-controlled accounts despite knowing of Alameda and FTX's wrongful conduct.

## VII.   THE FDIC REPORT ON SIGNATURE'S DEMISE DEMONSTRATES DEFENDANTS' WRONGFUL CONDUCT

257.    In late March 2023, FDIC Chairman Martin J. Gruenberg commissioned the FDIC's Chief Risk Officer to conduct an internal review of the agency's supervision of SBNY, and to produce a report to the FDIC Board of Directors, for release to the public.[39]

258.    The FDIC Report explains that "the quality of an institution's management, including its board and executive officers, is a critical factor in the successful operation of an institution. The board has overall responsibility and authority for formulating sound policies and objectives for the institution, for effectively supervising the institution's affairs, and for promoting the institution's welfare. . . . Executive officers, such as the President[, *i.e.*, Defendant Howell] and Chief Executive Officer[, *i.e.*, Defendant DePaolo] . . . have primary responsibility for managing the day-to-day operations and affairs of the bank."[40]

259.    According to the FDIC Report, the **"the root cause of SBNY's failure was poor management."**[41] In particular:

> SBNY's board of directors and management pursued rapid, unrestrained growth without developing and maintaining adequate risk management practices and controls appropriate for the size, complexity and risk profile of the institution. SBNY management did not prioritize good corporate governance practices, did not always heed FDIC examiner concerns, and was not always responsive or timely in addressing FDIC supervisory recommendations (SRs). SBNY funded its rapid growth through an overreliance on uninsured deposits without implementing fundamental liquidity risk management practices and controls. Additionally, SBNY failed to understand the risk of its association with and reliance on crypto industry deposits or its vulnerability to contagion from crypto industry turmoil that occurred in late 2022 and into 2023. . . . SBNY's poor governance and inadequate risk management practices put the bank in a position where it could not effectively manage its liquidity in a time of stress . . . .[42]

260.    FDIC found that SBNY and its officers and directors—the Individual Defendants are the Bank's top Board members and executive officers—made serious errors in both their affirmative actions,

---

[39] *See* FDIC's Supervision of Signature Bank (April 28, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23033a.pdf [hereinafter "FDIC Report"].

[40] *Id.* at 21.

[41] *Id*. at 2.

[42] *Id*.; *see also id.* at 7 (similar).

and in failing to act; and that they issued misstatements and misleading statements. This includes soliciting and profiting from rapid growth without commensurate risk management; taking on risky levels of deposits of crypto assets; failing to timely respond (if at all) to regulators' concerns over risk and anti-money laundering; failing to mitigate liquidity risks; and over-relying on uninsured deposits. Had Defendants not engaged in or permitted these acts and omissions, Plaintiffs would not have lost money.

261.    FDIC explained that, "[s]tarting in 2018, SBNY began to expand its business model by launching other lending and deposit gathering initiatives, including . . . a Digital Assets Banking Group to collect cash deposits and maintain operating accounts for various digital asset-related businesses. SBNY experienced tremendous deposit growth, primarily in large uninsured deposits, during 2020 and 2021, resulting in the bank's size more than doubling."[43] As the U.S. Government Accountability Office (GAO) reported in April 2023, from 2019 through 2021, SBNY grew significantly faster than its group of peer banks (134% compared to 33% by peer banks).[44] The "GAO noted that rapid growth can be an indicator of risk in a bank's business and that, in these cases, regulators are concerned with whether a bank's risk management practices can maintain pace with rapid growth."[45]

262.    The FDIC Report explained that "SBNY's board and management employed a strategy of rapid growth and expansion into the digital assets markets," which "exposed SBNY to greater susceptibility to liquidity, reputation, and regulatory risk due to the uncertainty and volatility of the digital asset space. The growth fueled by its pursue of digital marketplace players exposed SBNY to bank runs and contagion, particularly in regards to crypto-related entities such as FTX, Alameda, and Silvergate. . . . Management was

---

[43] *Id.* at 1; *see also id.* at 6-7 ("Starting in 2018, SBNY began to expand its business model by launching other lending and deposit gathering initiatives, including . . . a Digital Assets Banking Group to collect cash deposits and maintain operating accounts for various digital asset-related businesses; and Signet, a blockchain-based digital payment platform for SBNY customers. . . . SBNY board and management pursued a strategy of rapid growth, with total assets increasing by 175 percent from the end of 2017 ($43.1 billion) to the end of 2021 ($118.4 billion), before declining to $110.4 billion at the end of 2022.").

[44] *Id.* at 7 (citing *Bank Regulation, Preliminary Review of Agency Actions Related to March 2023 Bank Failures*, April 2023, GAO-23-106736).

[45] *Id.*

not sufficiently prepared to ameliorate the risks posed by its concentration of deposits and lending relationships in the digital assets marketplace . . . ."[46]

263.    After noting that SBNY's "Digital Assets Group was closely aligned with a new blockchain-based internal digital payment platform called Signet," which "created an incentive for existing bank customers to recruit their existing business relationships to become new SBNY customers in order to use the Signet technology," the FDIC concluded that "SBNY's significant client concentration of digital asset companies put it in a precarious position when the 'crypto winter' hit in 2022."[47]

264.    FDIC also explained that, in supervising SBNY, staff in the FDIC's Division of Risk Management Supervision (RMS) in its New York Regional Office (NYRO) "identified recurring liquidity risk management and other weaknesses, made numerous [Supervisor Recommendations (SRs)] including Matters Requiring Board Attention (MRBAs), and devoted significant resources to evaluating SBNY operations and risks," but "SBNY management's responsiveness and effectiveness in addressing SRs was mixed," and "[s]everal SRs relating to," among other things, "Bank Secrecy Act/Anti-Money Laundering (BSA/AML) . . . remained outstanding for multiple examination cycles."[48]

265.    When regulators voiced concerns, the Bank's:

management was sometimes slow to respond to FDIC's supervisory concerns and did not prioritize appropriate risk management practices and internal controls. Management was described by FDIC supervisors as reactive, rather than proactive, in addressing bank risks and supervisory concerns. SBNY management's primary focus on growth, deposits, and profits took priority over the responsibility to ensure sound risk management and responsiveness to SRs. . . . SBNY executives were sometimes disengaged from the examination process and were generally dismissive of examination findings. When SBNY did take action to address examination findings, SBNY's actions were more "check-the-box" or done to assuage the examiners, versus management understanding and appreciating the importance of underlying findings or control weaknesses.[49]

---

[46] *Id.* at 13.

[47] *Id.*

[48] *Id.* at 3.

[49] *Id.* at 9; *see also id.* at 36 ("The review noted that SBNY management had been disengaged from the examination process and generally dismissive of FDIC findings.").

266.    FDIC noted that "[a]s companies in new industries like crypto formed relationships with SBNY and various depositors were fleeing to the safety of U.S. depository bank accounts, SBNY reaped the benefits and grew assets by 46 percent and 60 percent year-over-year in 2020 and 2021, respectively."[50] But this came with increased risk. "Digital asset-related deposits alone represented 27 percent of total deposits at year-end 2021. Four separate depositors, each comprised greater than 2 percent of total assets, and together held 14 percent of total assets. Three of these depositors were digital asset-related clients."[51] However, "SBNY management did not acknowledge the risks this profile presented."[52]

267.    FDIC further noted that "[i]n many instances," it had "documented and discussed repeat findings or SRs and MRBAs across multiple examination cycles, particularly related . . . BSA/AML . . . without management effectively addressing the underlying supervisory concern. SBNY management failed to implement sufficient issues tracking processes that led to untimely remediation of numerous recommendations, findings, and deficiencies."[53] In fact, "SBNY was subject to several repeat criticisms, which reflected management's and the board's slow response to supervisory issues."[54]

268.    Moreover, "FDIC communicated a number of recommendations to SBNY through targeted review Supervisory Letters from 2017 through SBNY's failure on March 12, 2023," including concerns over, *inter alia*, "anti-money laundering (which includes BSA/AML, Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT), and Office of Foreign Assets Control (OFAC) targeted reviews)."[55]

269.    FDIC noted that, while "the NYRO rated SBNY's board and management performance as satisfactory until March 11, 2023[, g]iven the recurring liquidity control weaknesses, SBNY's unrestrained growth, and management's slow response to address findings, it would have been prudent to downgrade the

---

[50] *Id.* at 10.

[51] *Id.* at 11.

[52] *Id.*

[53] *Id.* at 9.

[54] *Id*.

[55] *Id*. at 18.

Management component rating to '3,' (i.e., needs improvement) as early as the second half of 2021," which would have "supported consideration of an enforcement action."[56]

270.    Indeed:

Although the NYRO rated board and management performance satisfactory in each roll-up [Report of Examination], examiners identified repeated concerns in the areas of liquidity risk management, BSA/AML, and MRM, that reflected negatively on management's performance. SRs and MRBAs in these areas remained outstanding for multiple examination cycles without management effectively addressing the underlying supervisory concerns. SBNY's breaches of key risk indicators and board-defined growth limits reflected negatively on management as did SBNY management's failure to implement sufficient issues tracking processes, which according got examiners "led to an inadequate identification of issues throughout the organization, inconsistent tracking, and a lack of timely remediation of numerous recommendations, findings, and deficiencies that have far exceeded their expected remediation dates."[57]

271.    In particular, the FDIC noted a report in 2019 that expressed "concerns with BSA/AML high-risk account reviews," which "continue to be evident due to both the number of outstanding reviews, and the quality of completed reviews."[58]

272.    The FDIC Report also noted an incident in 2021 in which SBNY "breach[ed] board-approved risk metrics."[59] Specifically, "SBNY breached a 10 percent key risk indicator for digital assets-related deposit growth. Instead of curbing growth, SBNY increased the limit to 35 percent of total assets. The board should have ensured that SBNY was in compliance with its liquidity risk appetite and risk tolerance, and to the extent the noncompliance was noted or identify, the board should have ensured appropriate actions were taken to return SBNY to the approved risk appetite."[60]

---

[56] *Id.* at 9; *see also id.* at 24.

[57] *Id.* at 22.

[58] *Id.* at 23.

[59] *See id.* at 9.

[60] *Id.*

273.    The FDIC Report also concluded that SBNY "implemented weak corporate governance practices," with examiners "not[ing] several examples where management made decisions without regard for having proper governance standards in place."[61] Moreover:

> The bank's organizational structure lacked clear decision-making processes, transparency as to who made decisions, and documentation as to approval and escalation protocols. Key decisions were often made by individuals or small informal groups of executive officers, without always following prescribed processes. Various committee charters did not provide for appropriate accountability, or allowed for concentrated authority without adequate safeguards.[62]

274.    Defendants' strategy of rapid growth and expansion into the digital asset markets, specifically, "exposed SBNY to greater susceptibility to liquidity, reputation, and regulatory risk due to the uncertainty and volatility of the digital asset space."[63] The increased risk of contagion and bank runs was particularly worrisome "in regards to crypto-related entities such as FTX [and] Alameda," because Defendants' expanded deposits for those entities "increased the volatility and susceptibility of SBNY's more traditional depositor sources to event shocks and depositor runs."[64] The Individual Defendants were "not sufficiently prepared to ameliorate the risks posed by [SBNY's] concentration of deposits and lending relationships in the digital assets marketplace . . . ."[65]

275.    The FDIC revealed that "[d]ue to weaknesses emerging from the 2022 targeted reviews" of SBNY, "the FDIC was considering pursuing [a] new enforcement action[] – a formal consent order related to AML/CFT and [Office of Foreign Assets Control (OFAC)] weaknesses and apparent violations . . . ."

276.    The FDIC ultimately concluded that "the bank could have been more measured in its growth, implemented appropriate risk management practices, and been more responsive to the FDIC's supervisory concerns . . . ."[66]

---

[61] *Id.*

[62] *Id.*

[63] *Id*.

[64] *Id*.

[65] *See id*.

[66] *Id.* at 5, 40.

## VIII.   SIGNATURE'S ACTIONS ARE PART OF A PATTERN OF CONDUCT FACILITATING MONEY LAUNDERING, CONFLICTS OF INTEREST, PONZI SCHEMES, AND OTHER FRAUD

277.    Over the years, Signature has been implicated in a number of money laundering and Ponzi schemes, and generally appears ready, willing, and able to bank persons and entities who use cryptocurrencies to carry out their schemes and crimes.

### A.    Signature Allegedly Facilitated William Landberg's West End Ponzi Scheme

278.    In 2015, a group of investors sued Signature Bank in both New York and Broward County, Florida, alleging fraud, breach of fiduciary duty and conspiracy in connection with a Ponzi scheme run by William Landberg—who pleaded guilty to securities fraud in 2011—through his alter egos, West End Financial Advisors LLC and West End Capital Management. *See Rizack et al. v. Signature Bank, N.A. et al.*, No. CACE-15-000367 (Cir. Ct., Broward Cty. Fla.) (filed Jan. 9, 2015).

279.    The Complaint alleged that "Signature had knowledge of Landberg's scheme from at least April 2008 when Signature first allowed funds to be transferred [from an interest reserve account] with full knowledge that the transfer was impermissible," and not only failed to stop the Ponzi scheme, but continued it, "actively taking more of Plaintiffs' money into the bank after having knowledge of the wrongful and illegal actions taken by Landberg." In an allegation particularly relevant here, the Complaint claimed that despite "the limited partnerships that purportedly pursued different investment strategies and had different investors, Landberg unlawfully managed and controlled, de facto, each of the entities on a day-to-day basis, indiscriminately using employees of one entity to perform functions for various entities."

280.    The cases were eventually dismissed on statute of limitations and personal jurisdiction grounds. But during discovery, the plaintiffs uncovered a number of documents showing Signature's disregard of its duty to prevent money laundering.

281.    For example, the plaintiffs uncovered numerous email communications in which Signature followed Landberg's instructions to "scrub" money by transferring various amounts between dozens of business and personal accounts; lent Landberg money against its internal policies, in exchange for higher lending fees; and generally bent over backward to help Landberg perpetuate his fraud.

From: Forie, James
Sent: Wednesday, June 04, 2008 2:12 PM
To: 'William Landberg'
Subject: RE:

The use of the word "consider" is troublesome?

From: William Landberg [mailto:wlandberg@westendfinancial.com]
Sent: Wednesday, June 04, 2008 2:03 PM
To: Forie, James
Subject:

Jim

FYI I was just informed that the Met Life funds were received by Sun Life.

We should be in receipt of the funds tomorrow. After I 'scrub' the funds I will consider paying down the loan!

B

William Landberg

Chairman

West End Financial Advisors LLC

70 East 55th St, 17th floor

New York, NY 10022

212.277.7620

212.588.8902 (f)

This message is intended only for the personal and confidential use of the designated recipient(s) named above. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of West End Financial Advisors.

**From:** Forie, James
**Sent:** Thursday, June 05, 2008 12:06 PM
**To:** 'William Landberg'
**Subject:** RE: Baum

Nothing as of 12:00.

**From:** William Landberg [mailto:wlandberg@westendfinancial.com]
**Sent:** Thursday, June 05, 2008 11:24 AM
**To:** Forie, James
**Subject:** FW: Baum

Looks like we should have money wired into the diversified account today.
Will scrub it and get it into the west merc account so you can debit.
b

William Landberg
Chairman
West End Financial Advisors LLC
70 East 55th St, 17th floor
New York, NY 10022
212.277.7620
212.588.8902 (f)

This message is intended only for the personal and confidential use of the designated recipient(s) named above. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of West End Financial Advisors.

**From:** "Forie, James" <Forie, James>

**To:** "Efstratiou, Chris" <Efstratiou, Chris>

**Bcc:** "cefstratiou@signatureny.com" <cefstratiou@signatureny.com>

**Subject:** FW: Wire

**Date:** 2008-06-04 15:17:32 -0400

**Importance:** Normal

FYI

-----Original Message-----
From: William Landberg [mailto:wlandberg@westendfinancial.com]
Sent: Wednesday, June 04, 2008 3:11 PM
To: Forie, James
Cc: kkramer@westendfinancial.com; Steven Gould; Janis Barsuk
Subject: RE: Wire

It will probably be wired into west end diversified, the insurance
dedicated fund.
We have to move it around and get it scrubbed and into west mercury so
you can then debit the account.
B

William Landberg
Chairman
West End Financial Advisors LLC
70 East 55th St, 17th floor
New York, NY 10022
212.277.7620
212.588.8902 (f)

282.    In one email, Landberg's primary Signature Bank contact, Chris Efstratiou, acknowledges that Landberg is "kiting" (covering a bad check from one bank account to another), notes a $100M[67] wire callback, and states that he "changed the date on [a] wire just in case . . . ."

> **From:** "Efstratiou, Chris" <Efstratiou, Chris>
> **To:** "Sherman, Arnie" <Sherman, Arnie>
> **Bcc:** "asherman@signatureny.com" <asherman@signatureny.com>
> **Subject:** FW: Earns Notification 10-09-08
> **Date:** 2008-10-09 13:35:08 -0400
> **Importance:** Normal
> **Attachments:** EARNS_NOTIFICATION_10-09-08.xls
>
> ---
>
> Because of the holiday Bill was not around for that $100M wire callback. However, I have a feeling we won't be doing it because that Congressional Bank bounced a check he deposited into the same account. Can you say "kiting"?
>
> Anyway, I changed the date on the wire just in case you still need to do it, but chances are not.
>
> ---
>
> **From:** Cruz, Silvia
> **Sent:** Thursday, October 09, 2008 10:24 AM
> **To:** Private Client Group - Myszko (111); Private Client Group - Vessecchia (153); Private Client Group - Kasulka (161); Private Client Group - Daperis (163); Private Client Group - Sirlin (181); Private Client Group - Eliades (221); Private Client Group - Broder (222); Private Client Group - Monaco (421); Private Client Group - Larsen (422); Private Client Group - Meyerson (423); Private Client Group - Liggio (521); Private Client Group - McLaughlin (721); Private Client Group - Stern (722); Private Client Group - Podolec (821); Private Client Group - Danon (921)
> **Cc:** Manzi, Patrick; Sowell-Jenkins, Margie; Cheng, Arline; Sampson, Faye; Bynum, Wendy; Mercado, Amelia; Williams, Kaaren; Francis, Sandra; Ashton, Dorothy
> **Subject:** Earns Notification 10-09-08
>
> Hello All,
>
> Please see attached file.

283.    In a particularly striking communication, years before he was caught, a Signature banker calls out Landberg's request for a complicated, multi-entity transaction as a "Madoff Ponzi." Signature nevertheless continued to service him and West End for years afterwards.

---

[67] Signature uses "M" for thousands (milli) and "MM" for millions (milli milli).

From: "Forie, James" <Forie, James>
  To: "Liggio, Charlie" <Liggio, Charlie>
  Bcc: "jforie@signatureny.com" <jforie@signatureny.com>
Subject: RE:
  Date: 2009-01-22 09:51:27 -0500
Importance: Normal

---

Madoff  Ponzi

---

From: Liggio, Charlie
Sent: Thursday, January 22, 2009 9:47 AM
To: Forie, James
Subject: FW:

I TOLD YOU !!!! If the fee is O.K. I bet he get's it. Charlie

---

From: William Landberg [mailto:wlandberg@westendfinancial.com]
Sent: Thursday, January 22, 2009 9:42 AM
To: Merlo, Michael
Cc: Liggio, Charlie; DePaolo, Joseph
Subject:

Mike

Here is transaction we discussed earlier today

West End Short Term is lending BDG, an approved borrower per West LB,  $5,880,000 or 70% of the appraised value of 2 parcels of land.

Funds for the loan to BDG are made up of two advances
80% of the $5,880,000 or $4,700,000 is advanced by West LB pursuant to tightly constructed loan agreement.
20% of the $5,880,000 or $1,176,000 is advanced by West End Mercury fund

Proceeds of the loan to BDG are as follows
$4,000,000 to pay down Century Bank
 1,880,000 is going to be used as follow

  $200,000 closing costs
$1,200,000 investment in West End Mercury
 $480,000 working capital to BDG

In order to close, I need to forward $5,880,000 to the escrow agent. I get $4,700,000 from West LB. It is usual and customary for all real estate closings to be handled with certified funds. Of course we could use regular checks but it is neater to do it all with certified funds.

My request to you is to either advance West Mercury $1,200,000 or me $1,200,000 and I will advance it to Mercury. Upon receipt of the proceeds BDG will direct at the closing the $1.200.000 to West End Mercury which will be used to pay down your advance or if you advance to me, to return to me and then return to SBNY.

Its clean and neat and  is done every day.

Would appreciate the accomodation of $1,200,000 for 2 hours. You dont have to fund until I receive the $4,700,000 from West LB---yes they send it to me first. I then add additional funds and wire to the escrow agent. No closing, no disbursements and the funds are returned back to me.

CONFIDENTIAL                                                                    SB056160

284.    Notably, Signature CEO, Defendant DePaolo, is a participant in many of these emails, including the one above, and another, replicated below, in which Landberg asks and he agrees to have a "John Dean" meeting.[68]



**From:** DePaolo, Joseph
**Sent:** Friday, June 06, 2008 10:14 AM
**To:** 'William Landberg'
**Subject:** RE:

Bill,

I just to Mike Merlo and Morey Danon......... They will call you shortly (within 10 minutes)...........

THANK YOU very much – it is much appreciated !

Joe

---

**From:** William Landberg [mailto:wlandberg@westendfinancial.com]
**Sent:** Friday, June 06, 2008 9:05 AM
**To:** DePaolo, Joseph
**Subject:**

Joe
I would like to spend 15 minutes with you in the very near term.
Sort of a John Dean meeting.
B

William Landberg
Chairman
West End Financial Advisors LLC
70 East 55th St. 17th floor
New York, NY 10022
212.277.7620
212.588.8902 (f)

This message is intended only for the personal and confidential use of the designated recipient(s) named above. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of West End Financial Advisors.

CONFIDENTIAL                                                    SB047795

---

[68] John Dean was White House Counsel for President Richard Nixon and was arrested for his role in the Watergate scandal.

**B.    Signature Hired Ivanka Trump to Its Board of Directors Despite a Conflict of Interest**

285.    In 2011, Signature added a then 29-year-old Ivanka Trump to its board of directors, despite doing substantial business with both her father, Donald Trump, and husband, Jared Kushner. SBNY "had long been used by Trump as he ran his business empire in New York."[69]

286.    According to one NBC report, SBNY was the "go-to for Trump and his extended family and network of colleagues."[70] For example, SBNY provided financing to Trump for a golf course in Florida.[71] It also lent money to Trump's former personal lawyer, Michael Cohen, to invest in a Manhattan apartment building.[72] Cohen later pleaded guilty to eight criminal charges: five counts of tax evasion, one count of making false statements to a financial institution, one count of willfully causing an unlawful corporate contribution, and one count of making an excessive campaign contribution at the request of a candidate (Trump) for the "principal purpose of influencing [the] election."[73] SBNY also lent money to Ivanka Trump's husband, Jared and Jared's father (Ivanka's father-in-law), Charles millions of dollars.[74]

287.    Giving seats on the board of a publicly traded company like Signature to people directly connected to large clients is frowned on by the industry. According to Charles Elson, a professor of corporate governance at the University of Delaware, "[d]irectors should not have significant commercial relationships with institutions on whose boards they sit" because they are "there to oversee operations and be objective."[75]

---

[69] Julia Mueller and Sylvan Lane, *Five things to know about Signature Bank,* The Hill (Mar. 13, 2023) *available at* https://thehill.com/policy/technology/3898329-five-things-to-know-about-signature-bank.

[70] Ben Popken and Hallie Jackson, *Deutsche Bank and Signature Bank cut future ties with Trump, citing Capitol riots*, NBC News (Jan. 12, 2021), *available at* https://www.nbcnews.com/business/business-news/trump-s-top-bankers-deutsche-banks-signature-cut-future-ties-n1253895.

[71] *Id.*

[72] *Id.*

[73] Nicole Hong, *et al.*, *Michael Cohen Pleads Guilty, Says Trump Told Him to Pay Off Women*, Wall Street Journal (Aug. 21, 2018), *available at* https://www.wsj.com/articles/michael-cohen-to-plead-guilty-to-criminal-charges-1534875978.

[74] Emily Flitter and Jessse Drunker, *How a Small Bank Became a Go-To Lender to the Trump Family*, NY Times (July 23, 2018) *available at* https://www.nytimes.com/2018/07/23/business/signature-bank-trump-kushner.html.

[75] *Id.*

288.    Nonetheless, Signature designated Ivanka Trump as an independent director and assigned her to board committees that set executive compensation and monitored risks while Signature continued to do business with her family. Signature also continued to renew credit lines to Ivanka's family, who by the end of 2012 owed the bank $4 million.[76]

289.    Defendants DePaolo and Shay later told the New York Times that they "almost regretted" having Ivank Trump on the board.[77]

**C.    Signature Allegedly Facilitated the ChinaCast Fraud**

290.    In December 2019, Chinese online education provider ChinaCast Education Corp. filed a lawsuit against Signature and two other banks, accusing them of letting the company's former CEO embezzle $35 million through accounts at the banks. ChinaCast alleged the banks ignored warning signs of money laundering and failed to stop transfers of money to a fictitious investment holding company in the British Virgin Islands with no legitimate business purpose. The parties apparently settled the matter.

**D.    Signature has Partnered with Bittrex, an Admitted Money Launderer**

291.    Between March 2014 and December 2018, for example, cryptocurrency exchange Bittrex violated sanctions and anti-money laundering laws at least 116,421 times, permitting persons located in the sanctioned jurisdictions of the Crimea region of the Ukraine, Cuba, Iran, Sudan, and Syria to use its platform to engage in approximately $263 million of cryptocurrency transactions.[78] In a Consent Order with the Financial Crimes Enforcement Network (FinCEN), Bittrex admitted to, among other things:

292.    Despite these dangerous and illegal practices, Signature partnered with Bittrex in May 2018. Since the practices were allowed to continue for at least several months after the partnership, Signature likely failed to perform adequate due diligence.

---

[76] *Id*.

[77] *Id*.

[78] *See* Dep't of Treasury, "Treasury Announces Two Enforcement Actions for over $24M and $29M Against Virtual Currency Exchange Bittrex, Inc," *at* https://home.treasury.gov/news/press-releases/jy1006.

E.    **Signature Banked Binance Despite Publicly-Available Evidence of its Misapplication of Customer Funds**

293.    Binance is one of the largest cryptocurrency exchanges in the world, but has come under a great deal of scrutiny. In particular, Binance has been accused of allowing Iranian cryptocurrency traders to dodge U.S. economic sanctions.

294.    Binance previously listed Signet as a method for onboarding funds. However, the entity that received funds sent to Binance via Signet was actually called Key Vision Development Limited ("KVDL").

295.    In December 2020, around the time Binance signed up with Signature's primary digital asset industry competitor, Silvergate Bank, a shell company was registered in Seychelles under the name Key Vision Development Limited. In addition, over time, Binance customers who experienced withdrawal issues reported receiving reports from their banks that the funds were returned to the sender, KVDL.

296.    Among increasing concerns about the legitimacy of its business, in May 2021, Silvergate terminated Binance as a client. Binance then transferred its business to Signature. KVDL was later stricken off the Seychelles register in September 2021, but on October 5, 2022, a Key Division Development Limited LLC was registered by unknown parties in Wyoming.

297.    On January 22, 2023, Signature announced that it was instituting a $100,000 minimum transaction amount for SWIFT transfers to Binance but—despite its awareness of allegations that Binance allows crypto traders to evade U.S. sanctions and its use of a shell company—continued to bank the company and allowed it to use Signet until Signature was shuttered in March 2023.

## PLAINTIFFS' INJURY

298.    Since Alameda, FTX, and related entities entered bankruptcy on November 11, 2022, Statistica Capital and its majority owner have been unable to recoup $308,532.50 intended for FTX but actually sent or diverted to Alameda via Signet.

299.    Since Alameda, FTX, and related entities entered bankruptcy on November 11, 2022, Statistica Fund has been unable to recoup approximately $1,718,071.37 of the funds it sent by wire, intended for deposit to FTX, from its Signature account to a North Dimension account controlled by Alameda.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Aiding and Abetting Fraud

300.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

301.    Alameda and FTX's conduct detailed herein constituted a fraud upon Plaintiffs. More specifically, FTX and Alameda made fraudulent misrepresentations and omissions to Plaintiffs about the nature of their FTX investments and how investor money would be applied and maintained. Plaintiffs relied to their detriment on these misrepresentations and omissions when depositing or investing assets with FTX. As a direct and proximate result of the fraud, Plaintiffs have been damaged as alleged herein.

302.    Defendants knew the conduct detailed herein constituted a fraud upon Plaintiffs.

303.    Defendants gave substantial assistance or encouragement to Alameda, FTX, and related persons and entities in defrauding Plaintiffs. Specifically, Defendants accepted billions of dollars of irregular deposits and approved or facilitated the related-party transactions, atypical lending, and the commingling and misappropriation of customer funds that marked FTX and Alameda's fraudulent scheme. Further, Defendants bolstered and promoted FTX as a business, and continued to offer banking and other services to FTX and Alameda despite knowing of the fraud.

304.    As a direct and proximate result of Defendants' aiding and abetting the fraud, Plaintiffs have been damaged in an amount to be determined at trial but not less than approximately $2.027 million.

### SECOND CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

305.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

306.    Alameda and FTX breached fiduciary duties owed to Plaintiffs.  Specifically, because Plaintiffs deposited funds into Alameda and FTX's control with the understanding that those entities would act in accordance with their promises regarding the use of such funds, including under FTX's Terms of Service and FDM's policy, Alameda and FTX owed investors the fiduciary duties of loyalty and care and to

deal honestly and in good faith. As detailed herein, Alameda and FTX breached those fiduciary duties by stealing customers' funds. As a direct and proximate result of the Individual Defendants' fraud, Plaintiffs have been damaged.

307.    Defendants had actual knowledge that Alameda, FTX, and related persons and entities breached fiduciary duties they owed to Plaintiffs. Specifically, Defendants knew that funds being deposited into Alameda's accounts were not being used consistently with the businesses' purposes and were not being held separately in trust for FTX customers, nor segregated or otherwise separated. Defendants knew FTX was not acting consistent with its Terms of Service.

308.    Defendants provided substantial assistance or encouragement to Alameda, FTX, and related persons' and entities' breaches of their fiduciary duties to Plaintiffs. Specifically, Defendants accepted and permitted the commingling of billions of dollars of FTX customer funds they knew Alameda and FTX had a fiduciary duty to separate and hold in trust for those customers. Further, Defendants bolstered and promoted FTX as a business, and continued to offer banking and other services to FTX and Alameda despite knowing of the breaches of fiduciary duty.

309.    As a direct and proximate result of Defendants' aiding and abetting of breach of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial but not less than approximately $2.027 million.

## **PRAYER FOR RELIEF**

310.    Wherefore Plaintiffs pray for judgment against Defendants as to each and every cause of action, and the following remedies:

a.    An Order that Defendants pay all compensatory and punitive damages permitted under the causes of action alleged herein;

b.    An Order requiring Defendants to restore, disgorge, or otherwise return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

c.    Pre- and post-judgment interest;

d.    Costs, expenses, and reasonable attorneys' fees; and

e.    Any other and further relief the Court deems necessary, just, or proper.

## JURY DEMAND

311.    Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: February 29, 2024

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, CA 92110
Phone: (619) 215-1741

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD (*pro hac vice*)
*tblood@bholaw.com*
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100

***Counsel for Plaintiffs***